Pete PAPPAS, Plaintiff-Respondent,

v.

Victoria PAPPAS, Defendant-Appellant.

No. 29215.

St. Louis Court of Appeals.
Missouri.

Sept. 18, 1956.

· John T. Sluggett, III, Clayton, for appellant.

Albert S. Ennis, William L. Pannell, Festus, for respondent.

SAM C. BLAIR, Special Judge.

This cause originated as an action for divorce by Pete Pappas against Victoria Pappas who countered with a cross-bill for separate maintenance. The sufficiency of the pleadings stands unquestioned and it suffices to say that they were adequate. The trial court adjudged that neither party was entitled to the relief prayed and en-

tered its decree denying Pappas a divorce and denying Mrs. Pappas separate maintenance. Pappas does not appeal. Mrs. Pappas appeals to this court to grant her the decree of separate maintenance which the trial court refused.

■ Mrs. Pappas contends that Pappas forced her from their home by offering her indignities which rendered her life intolerable and that thereafter he failed to contribute to her support. Section 452.-130, V.A.M.S. Pappas does not claim that he contributed to her support after her departure and failure to support as an issue drops from the case. What remains for Mrs. Pappas to show us by a preponderance of the evidence, if she is to obtain separate maintenance from us, is that Pappas actually was guilty of indignities forcing her from the home and justifying her in refusing to live with him longer. Moreover, she cannot prevail unless she can establish indignities that would entitle her to a divorce if that were the relief sought. Forbis v. Forbis, Mo.App., 274 S.W.2d 800, 807 [24–28].

The parties were married on August 6, 1949, and lived together until June 22 or 23, 1953. Mrs. Pappas was 25 years of age and Mr. Pappas was about 59 years of age. The marriage was never one of contentment or peace. Pappas owned a home in Crystal City. They moved into this home. Mr. Pappas believed the home was a suitable habitation, but Mrs. Pappas seems to have regarded it as rather a hovel. There is little question that it needed repair. Although she had visited in the home about five times before the marriage, and had expressed no disapproval, she told Pappas she could not live in it, "colored people live better than I do," and she insisted on making improvements at once. Pappas testified that he authorized her to make the improvements she wanted and she testified that he refused to allow almost all of them. Pappas built a new kitchen, bathroom, utility room, and two closets at her request. Mrs. Pappas does not dispute this. She made much of spending money of her own on these improvements, but cross-examination disclosed the sum she spent was "close to $50.00." She claimed that the gas stove and water heater leaked gas and were dangerous, and had been declared so by the gas company. Pappas denied this. However, he stated that he and she selected a new gas stove and ordered it delivered to the home but that Mrs. Pappas and her mother countermanded the order. He did not know why. Mrs. Pappas denied that she countermanded the order but gave no explanation why the stove was not delivered or why she did not insist on delivery. Pappas said he was ready to buy her what she wanted and did buy a new hot water heater, a washing machine, and a sewing machine. He said she asked for new kitchen cabinets and he ordered them and she refused them. Then she demanded a $30,000 home. She said Pappas had indeed promised to build a new home. She said she wanted the cabinets, ordered Youngstown cabinets, and then Pappas "fussed" and said, "What do you want with all those G. D. cabinets? What do you need them for?" The record is not clear but the import of her testimony is that she did not get the cabinets. Mrs. Pappas testified that Pappas was miserly and refused to give her money for herself and the household needs. He testified he gave her "whatever she asked for." "Many a time I gave her $50, $100, $20. I gave her money to buy everything." He said he did not know what she did with the money. Mrs. Pappas was very critical of the furniture in the home, but when the parties finally separated she took virtually all of the furniture with her, including the living room suite about which she had been most critical.

Mrs. Pappas testified that she was a good housekeeper and kept the house as neat and clean as its condition permitted. Pappas testified that she was careless and neglectful, and spent two or three days of almost every week in St. Louis after the first year of their marriage. She denied

this, and she claimed her only substantial absence from home was one of three weeks "when he run me out with a gun." When cross-examining counsel called her attention to the testimony of "four or five witnesses who live close there, who have testified you would be gone three or four days at a time very frequently," and asked her if their testimony was true, she answered, "It is not." When asked if any of these witnesses who were neighbors had anything against her, she said she hoped they did not. She only stated she did not know why they would "give false testimony."

She charged Pappas with abusiveness and with cursing her frequently. Pappas said it was she alone who was abusive and that she cursed him frequently. "Many a time," he said, "I would walk away, go lay down some place so I could get out of the way, like a dog does when he goes away." Mrs. Pappas denied that she abused and cursed Pappas and said she always called him "Honey." She said she never showed any temper. "I was always very sweet and kind to him, very patient." Pappas admitted that he was "no angel" and sometimes "talked back" when his wife abused and cursed him.

Mrs. Pappas charged Pappas with assaulting her while she was in a closet. Pappas denied this and said it was Mrs. Pappas who made an assault on him in the closet and that he had to hold her arms to keep her from beating him up. He said she also called him a "son-of-a-bitch," a thief, and a crook. She denied this and stated that she merely said to Pappas that some of the household articles were missing and that the locks ought to be changed.

She said Pappas chased her with a gun on Palm Sunday, and Pappas denied that he did so. She said, "He was always going to kill me and kill himself." He threatened to do so "about two, three, or four times a month." Pappas denied that this ever happened. He testified that Mrs. Pappas assaulted him on a public street of Crystal City while he was in conversation with the county sheriff and others and cursed him and called him a "son-of-a-bitch." She had tried to buy some gasoline from a service station and been refused credit. She told Pappas, "You son-of-a-bitch, I can't buy $2.00 worth of gasoline on credit." Apparently she laid the cause of this refusal at Pappas' door. Pappas testified, "They sell nothing on credit." He said, "I walked away and never said one word. She said, 'I am going to follow you in your place, if you go in I am going to kill you.'" Mrs. Pappas admitted the encounter and said this was the only exception to her gentle and patient treatment of Pappas.

Pappas owned a tavern building in Crystal City and a farm outside the city. The tavern building and the farm were leased to tenants. Pappas testified that Mrs. Pappas interfered with his business, that she ordered the tenants out of the tavern, and that she and her mother interfered with the operation of the farm and drove workers away. The tension seems to have been increased by the blatant meddling of her mother who arrogated to manage the farm tenants and frequently told them, and told Pappas, that she would show Pappas who was the "boss." Mrs. Pappas herself publicly made the same statement more than once. That she and her mother both made these statements was attested by disinterested witnesses. On one occasion a man was cutting and baling hay for Pappas and storing it in his barn on shares. "She went over and stopped him and run him off." Pappas persuaded her to allow the man to return and resume work. Then Mrs. Pappas "and her mother ran him off and told him not to come back, that they were going to arrest him for trespassing, so the hay was left on the ground and wasted because I couldn't take care of it myself." Mrs. Pappas and her mother told Pappas, who claimed he was unable to do heavy work, to put up the hay himself. The nomencla-

ture they used in adjuring him to arise from a seated position and to bale and store the hay himself was altogether inelegant. Mrs. Pappas answered these and other charges of interference with the omnibus rejoinder, "I didn't interfere with his business, I have always helped him. * * * He would ask my advice and we would talk things over." He said she quarreled with him many times because he refused to place the title to all of his real estate jointly in their names. "She fussed and cussed all the time, wanted to know why I didn't put her name on the deeds." This continued "up until the time of the separation."

Mrs. Pappas testified that Pappas continually sought to coax her into the performance of sex practices that were unnatural and that she refused and consulted a doctor who advised her to continue her refusal. Pappas branded her testimony as "a lie." It is a case of the oath of Mrs. Pappas against that of Pappas with no circumstance anywhere to corroborate either. We do observe that the coarse language she chose to employ in a public courtroom to describe these practices, when language less elemental would have served as well, scarcely encourages a high estimate of her credibility on this branch of the case.

Mrs. Pappas has little to corroborate her in this record and there is much to corroborate Pappas. We recognize that there is no absolute rule which requires corroboration of a party's own testimony as a prerequisite to the right to separate maintenance or to divorce. But corroboration, or the absence of it, can be, and is often, of significance. We believe it is of significance here. Mrs. Pappas produced four witnesses, her stepfather and three doctors who had treated her. Her stepfather testified that on one occasion he and his wife were visiting at the home and Pappas threatened to kill all of them and then kill himself. This testimony was not developed, we notice, on his direct examination but was elicited on cross-examination by Pappas' counsel. Oddly enough, Mrs. Pappas made no reference at all to this occurrence anywhere in her testimony. On the other hand, Pappas testified he had never threatened to kill anyone. He did say, "One time I told them, I said, 'I'm getting tired of this fighting,' the way she treated me and the way her mother fussed at me. I said, 'I'm going to kill myself if it keeps on like this.'" Relevant to the charge that Pappas was a man of violent tendencies is the testimony of seven of his neighbors and friends that they had known him for years and that he was peaceable and law-abiding. Actually, Pappas had lived in the community for more than forty years and had served as deputy sheriff and was night marshal of Crystal City at the time of the trial. He must have been held in some esteem in the community.

On the other hand, there is much in this record to corroborate Pappas' charges that Mrs. Pappas was frequently absent from the home, interfered with his business, was quarrelsome and argumentative, called him stupid, insulted his friends, called him a thief and a crook, publicly accused him of stealing a neighbor's hay, assaulted him in the presence of the sheriff and others, called him a "son-of-a-bitch," threatened to kill him, and frequently cursed and abused him. He produced twelve witnesses, each of whom corroborated one or more of these charges. All were disinterested. Most said that when Mrs. Pappas abused or cursed him he merely walked away or asked her to be quiet. None said he retaliated in any way. One neighbor, without objection, even testified that Mrs. Pappas was so quarrelsome and troublesome that his wife and he seriously considered selling their property and moving from the neighborhood.

The three physicians were produced by Mrs. Pappas to testify concerning a back injury which she claimed was due to mistreatment of herself by Pappas. On April 28, 1952, she was seriously injured in an automobile accident. She spent two weeks

in a hospital in St. Louis. The physicians who attended her there were not produced. Pappas, after her release, she was still complaining, took her to Dr. Bertalan Bolgar, Festus, Missouri. Dr. Bolgar said she "complained of pain all over her body * * * I imagine she was hurt very badly." "She complained about everything, legs and *back* and chest." Presently she became dissatisfied with her progress and discontinued seeing Dr. Bolgar. That same year, in May, she went to Dr. Hanford Phillips, St. Louis, Missouri. The doctor said, "She had numerous complaints. She had been recently in an automobile accident and she had many bruises and contusions on various parts of her body. Her chest was bruised and she had some skinned places on her knees. I forget all the complaints. It was ten or fifteen different individual complaints." "*Her main complaint was the upper part of her back.* * * * I believe the main complaint as far as her back was concerned was up in the dorsal part, the chest part of her *back.*" Mrs. Pappas flatly denied that she told her witness, Dr. Phillips, that she had received a back injury in an automobile accident. "I had no back injury at the time of the automobile accident. I never complained of any back injury. * * * He said, 'Were you in an automobile accident?' I said, 'Yes.' He said, 'Did you hurt your back at that time?' I said, 'No.' "

Near the end of May the same year, about the time she went to Dr. Phillips, Pappas, according to Mrs. Pappas, "come viciously at me with a gun and jerked me out of the chair and threw me on the floor." "I said, 'God is going to punish you for that.' I stayed all day in bed and left in the morning and went to my mother's. * * * Afterwards I stayed three days for treatment. (The doctor who treated her was not called.) I didn't know what was wrong, I didn't know my back was injured at the time." Pappas branded this story as "a lie." Dr. Phillips continued to treat Mrs. Pappas "for a little over a year." Some-

time during the treatment, the doctor could not say when, she told him "she was jerked out of a chair and thrown on the floor and hurt herself." Finally, she quit calling on Dr. Phillips and submitted herself to Dr. Fred Emmert, St. Louis, Missouri, in July of the next year, 1953. The doctor said, "She gave me the history that she was separated from her husband and that she had never had a backache before, that she was struck by her husband, knocked over a chair, from that time on began having backaches." The doctor was positive that she told him she had been *struck and knocked over a chair,* not jerked from it, and that she had never had a backache before that occurrence. He was positive, too, that she told him nothing about any injury to her back which she received in an automobile accident. There is no suggestion that Drs. Bolgar and Phillips, or Dr. Emmert for that matter, were not disinterested witnesses. Dr. Bolgar was positive that Mrs. Pappas complained of pain in her *back* when she came to him about two weeks after the automobile accident. Dr. Phillips was positive that she gave a history of an *automobile accident* when she came to him and that "her main complaint was the upper part of her *back.*" Sometime during the year of treatment, *he could not say when,* she did tell him that she had been jerked from a chair and been hurt, but this record makes it clear that originally she went to Dr. Phillips complaining of a back injury sustained in an automobile accident. When she finally reached Dr. Emmert about a year later, she attributed her back injury to being *struck and knocked over a chair,* not jerked from it, and not to the accident. Obviously the story underwent enlargement as time went by. The trial court concluded that the weight of the testimony was against Mrs. Pappas on this branch of the case. We agree.

Our duty is to review the facts, "as in suits of an equitable nature", and to reach our own conclusions, a duty we cannot abdicate. Notwithstanding, we are forbidden to disturb this decree unless we de-

termine it to be clearly erroneous, and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses. Woodman v. Woodman, Mo. App., 281 S.W.2d 555, 559; Forbis v. Forbis, supra, 274 S.W.2d 809; Section 510.310 (4), V.A.M.S. We cannot declare it is "clearly erroneous" unless we can discover and present some good reason for that conclusion. Forbis v. Forbis, supra, 274 S.W.2d 809. And though our duty is to reach our own conclusions, we have always an equal duty to defer largely, or, as the books say, to accord great deference, to the conclusions of the trial court if the solution of this controversy depends in the final analysis on the credibility of the witnesses and we find their evidence is in sharp and irreconcilable conflict. Luckett v. Luckett, Mo.App., 263 S.W.2d 41, 44 [3–4]; Woodman v. Woodman, supra, 281 S.W.2d 560 [7]; Pickett v. Pickett, Mo.App., 150 S.W.2d 587, 589 [2–4]; Williamson v. Williamson, Mo.App., 164 S.W.2d 606, 610 [2]; Culp v. Culp, Mo.App., 164 S.W.2d 623, 626 [7]; Vermillion v. Vermillion, Mo.App., 130 S.W.2d 195.

■ What we have recited of the evidence must demonstrate how bewilderingly at loggerheads is the testimony of the two parties. Completely almost it consists of flat accusations of wrongdoing met by denials of wrongdoing just as categoric. Where there is corroboration, it lies on the side of Pappas. Certainly to meet situations like this is one purpose of the rule of deference and of the statutory denial to appellate courts of all right to disturb decrees on the facts unless they are "clearly erroneous." Our view is that this record strongly calls on us to apply the rule of deference to the conclusions of the trial court and to refuse to substitute our own. What we say is no abdication of our duty to review the facts and to reach our own conclusions. It is adherence to our duty. This transcript has been carefully reviewed. But this controversy depends mostly for its solution on an assessment of the credibility of two opposing witnesses. Their credibility was as-

sessed by the trial court whose opportunity for discovering the truth was far better than the one we bring to the task. For what can be gained from the cold print of a transcript many times is far inferior to what the trial judge gains from actually hearing the witnesses and observing their appearance and demeanor while they testify. Confronted by the voluminous testimony in this record, and acknowledging that it is to us largely irreconcilable, it would be rash indeed for us to substittue our conclusions for those of the trial court on any theory that the latter were clearly erroneous or erroneous at all.

Taking this view, we are left with no alternative but to defer to the conclusions of the learned judge who tried the cause and to affirm the decree denying separate maintenance. It is so ordered.

ANDERSON, P. J., and RUDDY, J., concur.