Madolin C. WOODMAN (Plaintiff), Respondent,

v.

Russell J. WOODMAN (Defendant), Appellant.

No. 29202.

St. Louis Court of Appeals.

Missouri.

July 19, 1955

556

———◇———

Lashly, Lashly & Miller, and Robert L. Brown, St. Louis, for appellant.

George L. Stemmler, St. Louis, for respondent.

MATTHES, Judge.

On June 16, 1953, plaintiff filed her petition for divorce; on June 26th of the same year she filed her motion for alimony pendente lite, etc. She chose to convert the action to one for separate maintenance, which was done by the filing of an amended petition on December 30, 1953. In time defendant filed an amended answer thereto, together with his cross bill, in which he prayed for a divorce. After trial the court rendered judgment in favor of plaintiff on her cause of action, ordering defendant to pay $300 a month for her support. By the judgment defendant's cross bill for divorce was dismissed. Defendant appealed but in this court does not question the action of the lower court in dismissing his cross bill for divorce, the only point raised being that the proof failed to establish the two elements necessary to sustain an action for separate maintenance, viz., that defendant abandoned plaintiff and that he failed to support her after separation and prior to filing of her suit for separate maintenance.

The parties were married on October 14, 1939. In her petition for separate maintenance plaintiff alleged that the parties separated on April 27, 1953. The evidence adduced by plaintiff was sufficient to establish that the parties did separate on that date. The defendant, however, took the

position below and here insists that plaintiff left him without cause on June 30, 1953. We shall hereinafter give further consideration to the evidence on that question. There were no children born of the marriage, and at the time of the trial plaintiff was 52, and defendant 53 years of age. The record discloses that at and prior to the time of the marriage, plaintiff was employed as a schoolteacher. She continued teaching until February, 1945, earning $2,090 per annum. Defendant became General Chairman of the Order of Railroad Telegraphers in 1942, and in June, 1952, he was elected as one of the vice-presidents of that organization, and at that time his salary was increased to. $12,000 per annum which he was being paid at time of trial. The parties moved to the City. of St. Louis in January, 1952, and were residing in that city. when the difficulty between them arose which. gave rise to the instant litigation.

According to plaintiff's testimony, prior to April 27, 1953, there had been no serious conflict between her and defendant. She did testify, however, that in August, 1950, she returned from California where she had been visiting, unexpectedly, and one week before she had planned to do so. Upon arriving at the home of plaintiff and defendant at 9:00 o'clock a. m., she found one Mary Jane Moss, disclosed by the evidence to be an employee of the Order of Railroad Telegraphers, sitting at plaintiff's dressing table. Upon demanding an explanation, defendant stated that he and the other woman were going on a picnic. Defendant flatly denied any such occurrence.

The main trouble, according to plaintiff's testimony, had its. inception on April 27, 1953. At about that time she had obtained employment, and was anxious to tell her husband about her work on the evening of April 27th. Shortly after he came home, and before plaintiff had an opportunity to talk about her position he suggested that she go to the State of California and stop off at Reno. When plaintiff responded by saying, "Reno", he replied: "What do people usually do in Reno; they get a divorce." During that same conversation defendant told plaintiff he wanted a divorce. In a short while, and after some further conversation, defendant went to his room and locked the door. While the parties continued to sleep in the same apartment until on or about June 30th, the defendant, upon arriving at home at night, would go to his room and lock himself in. There were conversations, however, during that period between the parties in which defendant kept insisting that plaintiff obtain a divorce, as demonstrated by the following testimony of plaintiff:

"I can't give you any exact dates, but several times I followed Mr. Woodman to the little back bedroom and I stayed in the room there and we talked, and always this grinding away, 'When are you going down to get this divorce; when are you going to get these papers signed' and so on and so forth, 'Get this thing over with'."

Plaintiff also testified that around April 27th defendant told her she would have to leave town; that he would send the furniture to her, and he did not want her to remain in St. Louis. She testified defendant left St. Louis, Missouri, around May 1, 1953, and was gone about nineteen days, during the course of which he did not communicate with plaintiff. This was the first time during their married life that she did not hear from her husband when he was away from home. Plaintiff stated that on June 30th or July 1st she made up her mind to take a trip to Toronto, Ontario, to visit defendant's mother. She talked to her husband during the day and informed him she wanted to discuss the trip when he returned that evening. However, when he came in about 6:30, he went straight to his room and locked himself in. Then she wrote and left a note for her husband and departed. Upon returning to the apartment where she had been living she found everything removed, her furniture, clothing, even the light bulbs. The following day she went to the Ford Apartments in the City of St. Louis, having learned that her husband was living there. While standing outside the door she heard the voices of her husband and a woman, and when she knocked for

the purpose of gaining entrance the voices ceased. Then she became a "little hysterical", and threatened to "bang" in the door. This brought forth her husband, who told plaintiff, "You are not allowed to step over the sill of that door, because my lawyer told me you are not allowed to step in that apartment at all."

On two subsequent occasions when plaintiff went to the Ford Apartments to talk to her husband, she saw Mary Jane Moss either coming from or going into her husband's apartment.

Plaintiff testified that she had discharged all of her marital duties; took care of the home, prepared the meals, and in her words, "I threw myself whole-heartedly into this marriage. It was what I wanted all the time and I thought Mr. Woodman did and I tried to be a very loving wife and I thought I was. I thought he was, too." Although defendant's testimony indicated plaintiff's conduct did not measure up to that described by her, it is clear that the complaints he made were not of a serious nature. The fact that defendant has raised no question in this court concerning action of the trial court in dismissing his cross bill for divorce is indicative of the weakness of the grounds upon which he relied for the divorce.

The record discloses that there was little dispute between the parties as to the worldly assets owned by them. According to plaintiff, in April, 1953, when she charged that defendant abandoned her, the parties had a joint savings account amounting to approximately $5,977, and Government bonds registered in both of their names having an approximate value of $6,000. They owned a 1952 Dodge automobile of the value of $1,200, and household furniture and furnishings, the value of which was not disclosed by the testimony. Some time following April 27th, plaintiff took possession of the bonds, and transferred the fund from the joint savings account to an account in her own name. Defendant testified that he and his wife, after several conferences, agreed to divide their possessions equally. On September 12, 1953, an agreement, prepared by defendant, was signed by the parties, by which it was provided that plaintiff was to receive $7,000 in cash, the Dodge automobile, and all furniture and clothing then in storage. Defendant was to receive the Government bonds, and was obligated to pay the storage and transportation charges on the furniture, attorney's fee, and court costs. Prior to execution of agreement and after plaintiff took possession of the bonds, she converted $750 thereof into cash, which reduced the bond account to approximately $5,300. The bonds remaining were delivered by her to defendant in accordance with the agreement. While the record does not establish that plaintiff received $7,000 as provided in the agreement, it is clear that the total of the joint savings account withdrawn by her and the $750 received from the sale of the bonds, was in excess of $6,700.

Plaintiff testified that between April 27, 1953, the date of the separation, and June 1, 1954, when trial was commenced, defendant gave her a total of $105 in cash, of which $56 was paid to her attorney in connection with the filing of the divorce action. It was established, however, that on the date the separation agreement was signed, defendant paid three bills for plaintiff totaling $133.20. Three days later he paid the insurance premium on the Dodge automobile which plaintiff received amounting to $137.73, and thereafter paid two smaller bills in the sum of $21.77. Prior to September 12th he paid for some clothing purchased by plaintiff in the amount of $30.55.

Plaintiff testified, and it was not denied by defendant, that before April, 1953, defendant paid the rent on the apartment amounting to $115 a month; paid the bills for electricity and gas consumed, gasoline for the automobile, charge accounts at the department stores; and would leave approximately $200 in cash each month in the home to defray household expenses. It was her opinion that she would require approximately $350 a month to support and

maintain herself in a manner comparable to her standards of living prior to April, 1953.

At the time of the trial, according to the defendant's testimony, he possessed liquid assets of $7,435.10. The plaintiff's testimony indicated that her assets at that time, computed upon the basis of the automobile having a value of $1,200, amounted to $8,150.

■ An action for separate maintenance is a statutory proceeding governed by Section 452.130, RSMo 1949, V.A.M.S. The appellate courts of this state have consistently ruled that the statute means just what it says, and that before a wife can prevail in a suit for separate maintenance, she must prove abandonment by her husband and a failure on his part to support her. If either element is absent, she is not entitled to recover. Knese v. Knese, Mo. App., 217 S.W.2d 394, loc. cit. 398, and cases cited; Junge v. Junge, Mo.App., 211 S.W.2d 733, and Brooks v. Brooks, Mo. App., 211 S.W.2d 65. There being a statute authorizing the proceeding, a suit for separate maintenance is a statutory action at law, but it has been ruled that it is sui generis, and governed by the rules of equitable procedure, Bingham v. Bingham, 325 Mo. 596, 29 S.W.2d 99; Glick v. Glick, 226 Mo.App. 271, 41 S.W.2d 624; Brooks v. Brooks, supra, and each case of this character must rest and be decided upon its own facts, Brooks v. Brooks, supra. While we are not bound by the action of the trial court, it is our duty to defer to its findings unless we can point to some reason for not doing so, Reeve v. Reeve, Mo.App., 160 S.W.2d 804, loc. cit. 807, and cases there cited.

■ Careful consideration and analysis of the record compels the conclusion that the points raised by defendant cannot be sustained. There was ample evidence adduced to show that from April 27, 1953, to June 30th or July 1st of that year (the latter being the date when plaintiff testified she left to visit defendant's mother in Canada), defendant refused to live and cohabit with his wife. Close scrutiny of the defendant's testimony fails to reveal any denial by him of plaintiff's testimony with respect to the conversation between them on April 27, 1953, at which time he suggested that plaintiff go to Reno and get a divorce. Neither did defendant deny that on and after that date, upon returning in the evenings to the apartment where the parties lived, he would seclude himself in his room with the door thereto locked. No explanation was offered by the defendant for this conduct, so it follows that it was without cause. Between the 27th of April and the date when plaintiff went to Canada, the defendant kept "grinding away" about the divorce, insisting that they, "Get this thing over with". While the defendant did not physically leave the apartment where the parties resided, his conduct in continuously locking himself in his room, viewed in light of his refusal to converse with plaintiff except as to a divorce, and his constant insistence that plaintiff get a divorce, constituted an abandonment as contemplated by the statute. Polster v. Polster, 145 Mo.App. 606, 123 S.W. 81. In a case of this kind there are three things required to show abandonment. They are: (a) cessation from cohabitation without good cause; (b) intention on the deserter's part not to resume the same; (c) absence of complainant's consent to the separation. Reeve v. Reeve, supra; Carder v. Carder, 227 Mo.App. 1005, 60 S.W.2d 706; Broaddus v. Broaddus, Mo.App., 221 S.W. 804. The conduct of the defendant prior to June 30, 1953, and his removal of the furniture and clothing from the apartment occupied by him at the time plaintiff departed for Canada, compels us to hold that the elements required to show abandonment were fully established in this case.

■ With respect to the issue of failure of the defendant to support plaintiff, it is strongly urged that plaintiff had possession of all of the jointly owned property of the parties from some time in June, 1953, until shortly following September 12, 1953. That being so, it is said that plaintiff had ample funds for her support. If we were dealing with a case in which the wife had taken possession of and retained all of

the holdings of the parties, and had received $50 per month for her support from the date of separation, as was the situation in Knese v. Knese, supra, relied upon by defendant, we could justify refusing to follow the findings of the trial court. In the cases of Herbig v. Herbig, Mo.App., 245 S.W.2d 455, and Bingham v. Bingham, supra, also cited and relied upon by defendant, the facts were entirely different from those herein presented, and consequently do not support defendant's position. In the instant case it is obvious that the parties considered all property to be jointly owned. It was the defendant's desire, as shown by his testimony, that an equal division thereof be made. By the property settlement agreement, prepared by the defendant, the intention of the parties was consummated. In this situation plaintiff received nothing more than that to which she was entitled and the funds available to her after the execution of the agreement were actually her own property. There was no contention by defendant in the trial court, neither does he here contend, that plaintiff appropriated all of the joint savings of the parties to her own use prior to the consummation of the settlement. While she did take possession of all of the assets, she retained them intact (except bonds in the sum of $750 which she surrendered for payment) until shortly after September 12th, the date the settlement agreement was executed, when she delivered the bonds to her husband and retained the cash.

That the defendant did not, subsequent to the abandonment, afford his wife a reasonable and comfortable living according to their station in life and the manner in which she had been accustomed to live, Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823; Bingham v. Bingham, supra; Reeve v. Reeve, supra, is hardly open to question. Whereas he had been paying the rent of $115 per month, the utilities, and gasoline for the automobile, and leaving $200 per month in the home for household expenses prior to the abandonment, subsequent thereto he gave her $105 in cash, $56 of which was used in connection with the

filing of the divorce action, and he paid bills totaling $323.25. Thus it will be observed that the total contribution amounted to $428.25 from and after April 27, 1953. Of this, all but a $6 doctor bill was paid prior to the date the amended petition for separate maintenance was filed on December 30, 1953. Defendant's position seems to be that because plaintiff did have funds available at all times from the date of the separation, she was not entitled to a judgment for support. A similar contention was relied upon in Junge v. Junge, supra, which bears a striking resemblance to the instant case. The contention was not allowed, this court stating, 211 S.W.2d loc. cit. 736: "We cannot construe the words in the Bingham case to mean that a wife must be reduced to poverty before such a suit can be maintained. Reeve v. Reeve, Mo. App., 160 S.W.2d 804; Carder v. Carder, 227 Mo.App. 1005, 60 S.W.2d 706; Burtrum v. Burtrum, Mo.App., 200 S.W.2d 80." In the Reeve case, supra, the wife had received from the time of the separation to the date of the trial $94.50 per month from a trust estate created by her husband, $1,-800 from the sale of the home, $100 for a trip, the payment of certain current bills by her husband, and $35 per month from September, 1937, to December, 1940, the date of trial. In addition he had paid all hospital and medical bills incident to an operation she had undergone. In affirming a judgment in favor of plaintiff, the court said, 160 S.W.2d loc. cit. 807: "Defendant relies on the case of Bingham v. Bingham, 325 Mo. 596, 29 S.W.2d 99, to support his contention that he had adequately supported his wife during their separation, but we do not believe the facts in that case make it controlling here. In a matter of this kind each case must be decided according to the facts in evidence. The purpose is not to enrich the wife, but to provide suitable support and maintenance for her, taking into consideration the manner in which she was accustomed to live with him, and his ability to provide support."

■ The record in this case bears resemblance to other cases of like character in that there was a sharp dispute in the

testimony of the parties litigant, particularly on the issue of whether defendant failed to support his wife. In this situation, the finding of the trial court is entitled to great weight, which rule is not an arbitrary or technical one but is founded on good reasoning and justice. Brooks v. Brooks, supra, 211 S.W.2d loc. cit. 68.

Since no reason appears why the finding of the trial court should not be followed the judgment rendered below should be and is affirmed.

ANDERSON, P. J., and WALTER E. BAILEY, Special Judge, concur.