Viola G. OAKES (Plaintiff), Appellant,

v.

Joseph G. OAKES (Defendant), Respondent.

No. 29711.

St. Louis Court of Appeals.

Missouri.

July 2, 1957.

William C. Lochmoeller, John W. Barry, St. Louis, for appellant.

Herman D. Olian, Louis E. Zuckerman, St. Louis, for respondent.

HOUSER, Commissioner.

This is an appeal from a judgment of the Circuit Court of the City of St. Louis dismissing a petition and denying a decree of separate maintenance.

Viola G. Oakes charged her husband Joseph with abandonment without reasonable cause for one year beginning April 6, 1954, failure and refusal thereafter to support her, and vagrancy. Joseph filed an answer consisting of a general denial and a charge that plaintiff had invited him to leave their house and move elsewhere, and that she was associating with another man. He also filed a cross-bill for divorce. After hearing the evidence the court found that plaintiff was not an innocent and injured party, dismissed plaintiff's petition and denied her separate maintenance. The court further found that defendant was not entitled to the relief prayed for, dismissed defendant's cross-bill and denied him a divorce. The wife appealed but the husband did not appeal.

Plaintiff complains that the court erred in dismissing her petition and in failing and refusing to award separate maintenance; that under the law, pleading and evidence she was entitled to such a decree. She contends that there was uncontradicted evidence that defendant left the home of his own free will and accord, never returned and failed to support his wife after April 6, 1954.

On this appeal we review the case upon both the law and the evidence and reach our own conclusions, not setting aside the judgment unless clearly erroneous and giving due regard to the opportunity of the trial judge to judge of the credibility of the witnesses. Section 510.310, subd. 4 RSMo 1949, V.A.M.S.

The parties were married in 1930 and lived together until April 6, 1954. At that time plaintiff, the mother of two married sons over 21 years of age, was 40 years old. Defendant had been an employee of Union Electric Company for 32 years at the time of trial. After the separation plaintiff continued to live at the same address in St. Louis in a house owned by the parties in their joint names.

In April, 1954 the husband filed a petition for divorce. The wife answered and countered with a cross-bill for separate maintenance. At the close of the husband's case the court on oral motion dismissed the petition, whereupon the wife dismissed her

cross-bill for separate maintenance. The present petition for separate maintenance was filed on August 2, 1955.

*Plaintiff's version of the facts:* Although she treated him with love and affection and performed all her household duties defendant, without cause and without her consent, left the home on April 6, 1954. She has requested him to return and on two or three occasions since the separation engaged in marital relations with him upon his promise to return, but he has failed to return. Defendant discontinued payment of the telephone bill in April, 1955, the electric bill in June, 1955. In August, 1955 the gas company shut off the gas for non-payment of a past due bill in the sum of $35. Defendant discontinued payments on the mortgage in August, 1955 and in September, 1955 discontinued payment of the water bill. He was earning a gross salary of $595 per month at the time of trial. After the separation and against her doctor's orders plaintiff took employment, at which she earns $52 per week take-home pay. Her living expenses, including doctor bills, approximate $260 per month.

*Defendant's version of the facts:* He gave her all of the necessities of life and everything she required, including a "first-class home with all repairing," paid all bills and gave her money with which to run the house. The separation was caused by her constant nagging and quarreling and the fact that she locked him out of the house and told him to get a room elsewhere and to get a divorce. She locked him out of his bedroom and required him to sleep in the living room on a davenette. She locked the doors and fastened the key in the keyhole with string, twine and Scotch tape. He would come home and find himself locked out of the house. On one occasion he came home to find his pajamas on the back porch with a hammer lying on them and a note from his wife saying "Use this if you want to get in." Tipped off by telephone on August 5, 1955, defendant went to the house. A blue station wagon was parked in the front. The license number on the station

wagon had been issued to one J——— K———, a 30 year old co-employee of plaintiff at her place of work. Defendant thereafter found the same station wagon parked in front of plaintiff's home on eleven occasions in August, 1955 at hours ranging from 6 p.m. to 3:30 a.m. In September, 1955 JK was at plaintiff's home on twenty-three of the thirty days; in October, six times. These are some of the hours at which defendant saw JK's station wagon parked in front of his wife's home after midnight: 12:20, 1:05, 1:10, 1:25, 1:30, 1:35, 1:45, 2, 2:35, 3 o'clock a. m. Photographs of the station wagon sitting in front of plaintiff's house, taken at 12:05 a. m., were identified by defendant's detective and acknowledged by JK. A private detective employed by defendant testified that he observed the blue station wagon parked in front of plaintiff's home many times in September, 1955. The first investigation made September 2 revealed the blue station wagon with JK's license number parked in front of the building, the front room of which was lighted up. A man identified as JK came out of the building at 2:45 a.m. and left in the station wagon. On September 3 JK arrived at 8 p.m. After JK entered the house a couple arrived in a Mercury automobile, and the man and woman entered the house. That couple left at 9:30 p.m., after which the lights in the house were turned down low. JK did not leave the house until 2:30 a.m., at which time the porch lights went on and JK and plaintiff, the latter of whom was dressed in shorts, came out on the porch. Plaintiff kissed JK and then he left in the blue station wagon. Practically the same thing occurred on September 5, 7, 9, 10, 11, 23, 24, 25, 29. The detective renewed his investigation on April 28, 1956 and found the station wagon there on that evening, as well as on May 5, 1956. The hours of arrival ranged from 7 to 9:30 p.m. and the hours of departure ranged from 11:35 p.m. to 3:10 a.m. on these occasions. Several times the detective saw plaintiff and JK kiss as JK left plaintiff's house.

Plaintiff sought to offset this testimony by evidence that JK was a friend of her son James; that JK and James were interested in model trains; that James had a model train set up in the basement of plaintiff's home; that James had invited JK to have supper at his mother's home on various occasions when JK's wife was sick and that after supper the two men would go to the basement for hours to work on the model train. There was testimony from JK, plaintiff, plaintiff's son James and plaintiff's daughter-in-law that at no time did JK express any affection toward plaintiff, kiss her or make love to her. Plaintiff and JK denied that they had kept company or associated with each other or that there had been any kissing or affectionate behavior as between them. James and his wife testified that they were at plaintiff's home at all times when JK was present and that nothing of the sort occurred.

▉ In cases of this kind, where there is a sharp dispute in the testimony and the evidence does not greatly preponderate one way or the other, we resolve the conflict by according due deference to the findings of the trial judge because of his opportunity to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony. Luckett v. Luckett, Mo.App., 263 S.W.2d 41; Schneider v. Schneider, Mo.App., 293 S.W. 2d 157. The same judge who heard this case conducted the trial of the previous domestic relations litigation involving these parties. He had an unusual opportunity to appraise the credibility of these parties. While we are not bound by the action of the trial court it is our duty to defer to its findings unless we can point to some reason for not doing so. Woodman v. Woodman, Mo. App., 281 S.W.2d 555.

After reading and re-reading the transcript it appears that defendant's version of the facts is the more credible, considering the nature and character of the testimony of the parties and of their corroborating witnesses. Strengthened by the decision of the trial judge, we find from the record that plaintiff is not an innocent party, by reason of the fact that she has been guilty of improper association with another man.

▉ While a suit for separate maintenance is a statutory action at law it is based upon equitable principles, La Presto v. La Presto, Mo.Sup., 285 S.W.2d 568; Wright v. Wright, 350 Mo. 325, 165 S.W.2d 870; Easley v. Easley, Mo.App., 266 S.W.2d 28, and governed by rules of equitable procedure. Woodman v. Woodman, supra, 281 S.W.2d loc. cit. 559, and cases cited. In order to be entitled to a decree of separate maintenance the wife must prove facts which would entitle her to a decree of divorce if that were the relief sought. Ellis v. Ellis, Mo.Sup., 263 S.W.2d 849; State ex rel. Fawkes v. Bland, 357 Mo. 634, 210 S.W.2d 31; Dietrich v. Dietrich, Mo. App., 209 S.W.2d 540; Meredith v. Meredith, Mo.App., 166 S.W.2d 221. One of these requirements is that the spouse seeking a divorce must be an *innocent* party. The equitable principle requiring the complaining party to come into court with clean hands applies not only in divorce, Cody v. Cody, Mo.App., 233 S.W.2d 777, but also in separate maintenance actions.

▉ The marriage contract imposes upon the husband the duty to maintain and support his wife, and the wife will be presumed to be entitled to support until it is shown that her right has been forfeited. Schulze v. Schulze, 212 Mo.App. 75, 251 S.W. 117. That obligation, however, is modified by the law to the extent that it obtains *while she properly demeans herself as a wife and companion.* Rutledge v. Rutledge, 177 Mo.App. 469, 119 S.W. 489. Thus where a wife leaves her husband, even if for a justifiable cause, and subsequently lives in open adultery she thereby forfeits her right to support from him. Webster v. Boyle-Pryor Const. Co., Mo.App., 144 S.W. 2d 828. While the proof in this case does not establish actual adultery by the wife it reveals a wholly improper and clandestine relationship with another man, under most

suspicious circumstances. This is not the case of an isolated act of imprudence, indiscretion or folly. Plaintiff has been guilty of a long-time and continuing course of reprehensible conduct over an extended period of several months, which constitutes a matrimonial offense and which, upon equitable principles, bars her from the right of separate maintenance by her husband. Brindley v. Brindley, 1898, 121 Ala. 429, 25 So. 751; Weitzel v. Weitzel (1928, Ont.), 3 DLR 261; Butler v. Butler, 1823, 4 Litt. 201; 42 C.J.S. Husband and Wife § 612 b, p. 208 et seq.

The judgment of the circuit court should be affirmed and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

RUDDY, P. J., and MATTHES and ANDERSON, JJ., concur.