**Alice May GRIESHABER (Plaintiff), Appellant,**

**v.**

**Elzie GRIESHABER (Defendant), Respondent.**

**No. 29954.**

St. Louis Court of Appeals. Missouri.

June 3, 1958.

McClintock & Medley, Flat River, for appellant.

J. O. Swink, Farmington, for respondent.

RUDDY, Presiding Judge.

A suit for separate maintenance was instituted by plaintiff (wife) against defendant( husband). Defendant filed a cross-bill for divorce. The trial court in its judgment found against plaintiff on her petition and against defendant on his cross-bill and ordered plaintiff's petition and defendant's cross-bill dismissed with prejudice. Plain-

tiff appeals from the judgment and decree dismissing her petition.

Plaintiff's petition was based on constructive abandonment by defendant as a result of conduct of the defendant which rendered her condition as his wife intolerable. Defendant in his cross-bill alleged indignities such as to render his condition as her husband unbearable.

■ The sole point relied on by plaintiff is that the decree and judgment of the trial court denying separate maintenance to her was against the weight of the evidence. We said in Woodman v. Woodman, Mo. App., 281 S.W.2d 555, loc.cit. 559, that:

"An action for separate maintenance is a statutory proceeding governed by Section 452.130 RSMo 1949, V.A.M.S. The appellate courts of this state have consistently ruled that the statute means just what it says, and that before a wife can prevail in a suit for separate maintenance, she must prove abandonment by her husband and a failure on his part to support her. If either element is absent, she is not entitled to recover * * *. There being a statute authorizing the proceeding, a suit for separate maintenance is a statutory action at law, but it·has been ruled that it is sui generis, and governed by the rules of equitable procedure, * * * and each case of this character must rest and be decided upon its own facts * * *. While we are not bound by the action of the trial court, it is our duty to defer to its findings unless we can point to some reason for not doing so, * * *."

Therefore, it is our duty to affirm the trial court unless its judgment is clearly erroneous. Oakes v. Oakes, Mo.App., 303 S. W.2d 940, loc.cit. 941.

With the foregoing principles in mind, we will examine the facts disclosed by the evidence.

Plaintiff and defendant were married in August of 1948 and lived on a farm about 6 miles from Ste. Genevieve, Missouri. This was the third marriage for plaintiff. She had two children by a prior marriage and she and defendant had 2 children born of their marriage. Plaintiff left defendant on September 5, 1956, and from the date of their marriage until the separation the parties lived on the aforementioned farm. The closest neighbors were about one-half mile from the home of the parties and the home was about one mile from the main road. Plaintiff had lived on a farm prior to her marriage with defendant. She had seen defendant's farm prior to the marriage and was acquainted with its accommodations and location. At the time of her marriage plaintiff knew she was going to live on defendant's farm after the marriage. Following their marriage they moved into an old house on the farm. The house had no modern conveniences, except electricity. Plaintiff and defendant lived in this house for six years and thereafter they built a new one. This new house had five rooms and modern conveniences but had no telephone.

Defendant was an iron worker and was engaged in hazardous work. His duties required him to connect structural iron pieces together at places as high as 465 feet. In the course of his duties he had to work at these extreme heights and places that offered dangerous footing. Most of his employment was in the area of the City of St. Louis and at times he worked in Alton and Belleville, Illinois. Defendant would leave for his employment as early as 4:30 a. m. and would return to his home about 6:30 p. m. At times he would have to drive as far as 100 miles to reach his work for the day. Plaintiff admitted that defendant was engaged in dangerous work. She testified that when he came home he would eat and talk a short while and then would go to bed. Plaintiff admitted defendant was not a "drinking man" and not a "gambling man" and that she had never suspected him of associating with other wom-

en. She further admitted that defendant supported her two children born of a prior marriage.

Defendant testified that plaintiff was a good wife and a good mother to the children. He said she kept the house clean and was a good worker. The only exception he made in this connection was a complaint about her cooking. He said he had "seen better cooks." However, he softened this complaint with the explanation that he thought she cooked to the best of her ability. Plaintiff helped defendant with the farm work. She helped with the hay crop and the feeding of the animals, made the garden and canned the products from the garden.

There was no conflict in the testimony concerning the aforesaid facts. We will now turn our attention to the testimony wherein an area of conflict seems to exist.

Plaintiff testified she asked defendant to have a telephone installed in the home and that he refused, telling her he did not want a phone. Defendant in answering this complaint testified that he tried to have a phone installed but was told by the telephone man that the party line was filled. Defendant further testified that he inquired about installing a private line and found the cost prohibitive.

Another complaint made by plaintiff was that she had no transportation while her husband was at work. She testified she had no means of getting to town or calling on friends and that she had to call on the neighbors to take her children to the doctor. She admitted there never was a time when the children were without medical attention when needed. There had been a truck on the farm. Plaintiff said she was unable to operate and handle this truck. Defendant admitted that he and plaintiff had discussions on the lack of transportation. However, he said he tried to teach his wife to drive an automobile, but had no success.

Plaintiff complained that her husband failed to give her extra money for her personal use although she admitted she got extra money when she purchased groceries in town. On the trips to purchase groceries plaintiff would cash defendant's paycheck on some occasions and on the others defendant would cash his check and give plaintiff money to purchase the groceries. Plaintiff admitted that defendant did not put any limit on the amount she could spend for groceries. She further admitted she had money left over from the purchase of groceries which she used for personal items. She said she bought books with some of this money.

Defendant testified he permitted plaintiff to buy whatever she wanted, adding that he never knew an instance when he told her not to buy something she wanted. He also said that to his knowledge there never was a time when she or the children ever wanted for food or clothing. In connection with this same complaint plaintiff testified that she was unable to buy the right kind of clothes for herself and the children. However, she admitted the clothes they had were adequate and sufficient. One of plaintiff's witnesses, Betty Hanks, testified that the children never looked neglected "as far as dress or cleanliness" were concerned.

Another complaint of plaintiff was that in the eight years she lived with defendant she "never knew what his business was, whether he had any money" or "didn't have any money * * *." She further testified she knew nothing about the affairs of defendant and that he seldom took her any place, although she admitted defendant took her to the show occasionally and to town once a week. She further admitted that defendant took her to see relatives and for automobile rides. However, it seems the only time she complained of these alleged grievances was at the trial, for when she was asked if she ever complained to her husband about these matters, she answered, "No sir, I didn't complain about it." Defendant testified plaintiff never said anything to him about wanting more entertainment or about not going to the show oftener. He said when plaintiff asked to see the neighbors and others he would take

her. On occasions when she wanted to visit in St. Louis he would take her.

Approximately two years before the trial of this case in the lower court several persons called on plaintiff at her home on the farm and talked to her about the Bible and some books they had for sale. Plaintiff testified that on this first visit these persons did not tell her they were representatives of a religious group known as Jehovah's Witnesses. However, they returned at a later date and disclosed their identity and the purpose of their visits. Thereafter, representatives of this religious group called at the home of plaintiff with greater frequency and soon plaintiff became a zealous worker in behalf of the Jehovah's Witnesses. Two members of this religious group who called on plaintiff were Kenneth Smedstad and Dorothy Smedstad, his wife. They were described by plaintiff as ministers of Jehovah's Witnesses. At the beginning of plaintiff's interest in this religious group defendant made no complaint but, as plaintiff's interest and zeal increased, defendant's acquiescence in her activities diminished. Plaintiff testified that defendant began to complain about her activities when she started to attend the Sunday afternoon meetings. At times he took her to these meetings willingly and at other times he did so reluctantly.

Plaintiff testified that defendant began to complain about some of the members of the religious group and called some of them uncomplimentary names. When plaintiff was asked what reasons defendant gave for his disapproval of the Jehovah's Witnesses she answered, "He said that they didn't salute the flag" and "He didn't like the idea that they didn't go to war." In this connection Kenneth Smedstad testified that he objected to service in the Armed Forces of the United States and to pledging allegiance to the flag of the United States. His objections were based on his religious beliefs.

Plaintiff further testified she tried to get defendant to read some of the literature of the Jehovah's Witnesses but that defend-ant read very little of it. It was admitted by the Smedstads that defendant was very friendly during their first visits and that on at least one occasion he invited them to an evening meal. Defendant in his testimony said that on occasions he did invite the Smedstads to stay for a meal. On one of the occasions when the Smedstads visited plaintiff and defendant one of the children kicked a leather briefcase of Kenneth Smedstad. Defendant testified that Kenneth Smedstad complained and said, "I don't see why people don't make their kids mind, * * *." Defendant then told Kenneth Smedstad that he did not want someone else coming into his home and telling him how to raise his children. After that statement the Smedstads got up and left. Kenneth Smedstad in his testimony denied that he complained about the child kicking his briefcase.

When plaintiff attended the meetings of the Jehovah's Witnesses she would take the four children with her. Kenneth Smedstad testified that the children would sit with the adults during the Bible studies. He admitted there were no special classes or training for the children.

Defendant in his testimony said he had no objection to his wife attending the meetings. He did object to the taking of the children born of the marriage with plaintiff. He testified that after the Farmington incident, which will be related later, he continued to take his wife to the meetings. He testified that while he tried to discourage his wife from attendance at the meetings, nevertheless he thought it was her choice which she was free to make. However, he said he told her to "tell these people to stay away because I don't want them bothering my children." Several times in the course of his testimony defendant made it clear that his principal, if not only, objection was the taking of the children to the meetings. He said he wanted his children to go to school and to be raised like other children. His testimony showed that he did not want his children raised under the influence and the teachings of the Jeho-

vah's Witnesses. He further testified that before his wife became interested in the Jehovah's Witnesses they attended the Methodist Church with the children.

On June 15, 1956, an essembly of the Jehovah's Witnesses took place at Farmington, Missouri. The testimony indicates this meeting was held every six months and members who lived within the area surrounding the City of St. Louis were invited. The assembly was held at the ball park. In connection with this assembly meeting plaintiff testified that she told defendant she expected to go to the meeting. She further testified that he did not tell her whether she could or could not take the children to this meeting. Plaintiff attended this meeting with the four children. She left about 5 p. m., before defendant arrived home from his work. Plaintiff testified that about 7 p. m. defendant came to the meeting and walked up to her and grabbed one of the children and slapped plaintiff. She did not recall that he said anything at this time, although in another portion of her testimony she testified that defendant said, "If there was anybody wanted to come down and do anything about it they could * * *." By this she meant that he challenged other members of the audience to try and stop him from taking his children. She testified that other people were sitting around in the ball park when the slapping incident took place.

Plaintiff further testified that she stayed for the rest of the services with her two other children and after the assembly was over she went back home and found the door locked. She testified that she did not think she tried to keep her husband from taking the child. Plaintiff's version of what occurred on this occasion was verified by the testimony of another witness. In the course of plaintiff's testimony about the slapping incident plaintiff said defendant had slapped her on another occasion. She said this occurred four years before the trial. Defendant denied this took place.

Defendant testified that on the morning in question plaintiff told him she was going to a meeting in town and he told her he did not want her to take the children to the meeting. He further testified that when he arrived home his wife and all of the children were gone and, after recalling his wife's statement made to him that morning, he then went to the meeting and found his wife and the four children. He further testified, I "told her I wanted to take my two kids and go home with them, * * *." He said that when he reached for one of the children his wife started squeezing the child and caused it to cry. Whereupon he told her to "quit it" and he said she kept on holding and squeezing the child and he then slapped his wife.

Defendant testified that he took the two children and proceeded to his home and stayed there about ten minutes and then he and the two children visited some neighbors where they stayed until about 10:45 p. m. He did not tell the neighbors about the incident at the ball park. The neighbors, Mr. and Mrs. Otto Buckholtz, verified this testimony of defendant.

Plaintiff testified that the Smedstads took her home after the assembly services. After she found the door locked she looked in the home through a window and she testified she saw her husband in bed. She said this was between 9 and 9:30 p. m. It will be recalled defendant said he was at the Buckholtz home until 10:45 p. m. Plaintiff further testified she was afraid to awaken the defendant and went back to town and stayed with some friends. The next day plaintiff again attended a meeting of the assembly and about 9:30 p. m. returned to her home. She testified her husband and the two children were not home when she returned. She said she went to bed and about midnight defendant came home with the two children. She further testified that defendant "grabbed me out of bed and started shaking me around." She said he did not hit her but he was acting like he would. She said he reminded her that none of her family or relatives followed the beliefs of Jehovah's Witnesses and that he thought their books

and teachings were not right. Although plaintiff testified defendant cursed her, she could not recall any of the curse words he uttered. When asked what she said, she answered, "I didn't say anything, I just let him go ahead and rave." Plaintiff's oldest daughter verified some of the happenings of that night but did not know how long it lasted because she said she went back to bed and fell asleep.

Defendant's version of this occurrence is at variance with that related by plaintiff. He said when he came home that evening his wife was in her daughter's bed and he asked his wife where she had been and she said, "It's none of your business." He responded by telling her he thought it was time to have an understanding "whenever it comes to a wife leaving a man and running around * * *." He said he saw no use in preaching a sermon to her and told her "come on and get in your own bed like you ought to." After some hesitation he said she went to bed with him and that was the end of the occurrence. He further testified he did not touch her or lay a hand on her all during that time.

Plaintiff further testified that defendant threatened to burn the books she purchased from the Jehovah's Witnesses. The next morning the books were gone and she surmised that defendant had burned them because she saw smoke in the yard. She said she replaced some of the books.

No other incidents took place after the assembly meeting incident until about the middle of August, when Kenneth and Dorothy Smedstad called at the farm home of plaintiff to talk to her about the Bible. Kenneth Smedstad said he knew that defendant did not want him to visit the home of plaintiff but said he went nevertheless because he and his wife had a standing invitation from the plaintiff. On the aforesaid date when the Smedstads called no one was home. It so happened that defendant did not work on that day and he and his wife went to town. When plaintiff and defendant returned to the farm the Smedstads were just leaving. Plaintiff and the Smedstads testified that on this occasion defendant rushed up to Kenneth Smedstad and grabbed him by the shirt and shook him and told him "I don't want you people on my place" and further told him to get out and stay out. They further testified that defendant challenged Kenneth Smedstad to a fight but he refused to accept the challenge. Plaintiff jumped between defendant and Kenneth Smedstad and parted them.

Defendant in his testimony admitted that the aforesaid incident took place. He said the Smedstads were on his property and that he had told his wife he did not want them around his home. He admitted that he challenged Kenneth Smedstad to a fight and added "because I never saw anybody that I'd leave my own home for to let him take over, * * *." He further testified that after the challenge the Smedstads got into their car and then called to his wife; that she ran to them, got into their car and left with them, leaving the four children with defendant. Plaintiff returned in about a half hour and nothing more was said. Defendant said nothing more to his wife, thinking it the better course. After that defendant said plaintiff cooked supper and everything appeared normal. Thereafter, it appears that the Smedstads did not again visit the home of plaintiff. However, the evidence does show that they would see plaintiff on the road outside the farm. Plaintiff admitted that these visits on the road took place and a witness for the defendant testified she saw them out on the road.

Defendant testified that plaintiff appeared all right after the August incident and that on the day she left him, which was September 5th, she cooked his breakfast and kissed him goodbye. When he returned home that evening plaintiff was gone. He found a note left by plaintiff which informed him she would advise him later as to her whereabouts. She took the four children with her and about three weeks

later defendant learned where she was through a former husband of plaintiff.

Plaintiff testified that she fixed breakfast and also lunch for defendant on the morning of the day she left. She did not tell defendant she was leaving nor did she tell the children until she was ready to leave. She and the children left in the car of Kenneth and Dorothy Smedstad. Before leaving she left the note found by defendant. The Smedstads took plaintiff and the children to the home of other members of the Jehovah's Witnesses where they stayed.

After defendant located plaintiff and the children he paid plaintiff $10 per week for the support of the children. After plaintiff left defendant, her former husband, father of two of her children, paid her $80 per month for the support of his two children. However, this money had not been paid by plaintiff's former husband when she was living with defendant.

During the cross examination of defendant he said that prior to the assembly incident at Farmington their marriage was successful and his wife told him on many occasions she was happy. He further testified that after the separation he tried to get plaintiff to return to his home but she refused.

■■ We pointed out earlier that plaintiff relies on constructive abandonment to support her claim to separate maintenance. In order to justify plaintiff's action in leaving defendant she must show that her husband was guilty of indignities that made her life intolerable and forced her to leave him. It is the burden of plaintiff to prove such indignities. Dietrich v. Dietrich, Mo. App., 209 S.W.2d 540, loc.cit. 544; Forbis v. Forbis, Mo.App., 274 S.W.2d 800, loc.cit. 807. It has also been held that the indignities must be such as would entitle plaintiff to a divorce in a suit seeking that relief. Oakes v. Oakes, supra; Prough v. Prough, Mo.App., 308 S.W.2d 294, loc.cit. 295. Also, where there is conflict in the testimony and the evidence does not greatly preponderate one way or the other, we resolve the conflict by according due deference to the findings of the trial judge because of his opportunity to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony. Oakes v. Oakes, supra.

■ Applying the rules of law we have stated to the facts of this case, we find no basis for disturbing the judgment of the lower court.

The complaints of plaintiff about the lack of a telephone and transportation were trivial and of no consequence. Plaintiff knew the farm home had no telephone or transportation when she married defendant. Defendant tried to get a phone and tried to teach plaintiff how to drive. She knew defendant was engaged in hazardous employment and that the long time spent on his trips to and from his employment left little time for social activities through the week. Defendant testified he satisfied her requests in this connection. Plaintiff conceded, that except for the incidents brought on by her affiliation with the Jehovah's Witnesses, defendant was a good man and had no bad habits.

Her complaint about having no extra money fell short of convincing proof. The same must be said about her complaint of knowing nothing about defendant's affairs and her testimony about his failure to get her and the children the kind of clothes she wanted. She admitted she did not complain to defendant about any of these matters. If these matters were as intolerable as plaintiff would want us to believe, certainly she would have complained about them to defendant and sought some sort of correction. This she did not do according to her own testimony. It is clear to us that she did not believe these matters made life with defendant unendurable at the time they occurred. It is obvious these complaints were afterthoughts in the hope that they would bolster her quest for separate maintenance.

We are convinced that prior to plaintiff's affiliation with Jehovah's Witnesses the home life of plaintiff and defendant was serene and surrounded with the happiness described by the defendant. What we have to say in this opinion is not to be characterized as an objection by us to plaintiff's affiliation with her newly found religious group. She was free to follow her religious beliefs in any manner or with any group she pleased. This was the attitude of her husband. While he tried to dissuade her from attending the meetings of this group, he nevertheless took her to the meetings and this continued after the assembly incident and it seems until the separation. The evidence clearly demonstrates that the only real objection defendant had was the effort of plaintiff to raise the two children born of this marriage under the influence and teachings of the Jehovah's Witnesses. Defendant resented her efforts and the efforts of the Smedstads in this direction. In connection with the Smedstads it must be said that they knew and acknowledged in their testimony that defendant did not want them on the farm. Despite this knowledge they persisted in calling on the plaintiff. It is our thought that under the circumstances they should have been satisfied with plaintiff's presence at the meetings.

As to the slapping incident at the assembly meeting, defendant had told plaintiff not to take the two children, but she stubbornly followed her own desires. Defendant had as much to say as plaintiff about the religious training of the children. While we do not approve of the slapping of his wife, we do believe that plaintiff's action in taking them to the meeting and in squeezing the child in an attempt to keep it from the defendant provoked the slapping incident and that defendant's action under the circumstances was excusable. Nor was the occurrence of the following night of any consequence. Plaintiff said defendant did not strike her but merely raved, cursed and shook her. Defendant denied that he shook plaintiff and denied that he raved at or cursed her. We defer to the trial court's finding on this occurrence.

The Smedstads must have known they were causing an estrangement between this husband and wife, because they called at the farm in August with the knowledge that defendant did not want them on the farm. Their visit on this occasion precipitated the rather vigorous warning given to them by the defendant. However, the Smedstads were not to be discouraged for they continued to visit plaintiff on the road outside the farm and aided plaintiff in her departure from the home. We see nothing wrong in defendant's conduct on the occasion of the August incident at the farm. It was an effort, as he said, to keep someone else from taking over in his own home.

We find no support in the evidence for the charge of constructive abandonment. Finding no error, the judgment should be affirmed. It is so ordered.

ANDERSON, J., and JOHN K. REGAN, Special Judge, concur.