**Sam FREDERICK, Plaintiff-Appellant,**

**v.**

**Rose Ann FREDERICK, Defendant-Respondent.**

**No. 9024.**

Springfield Court of Appeals,
Missouri.

Jan. 14, 1971.

Frieze & Crandall, Carthage, for plaintiff-appellant.

No appearance for defendant-respondent.

STONE, Judge.

This is a divorce suit, in which plaintiff Sam Frederick seeks to terminate the marriage solemnized with defendant Rose Ann Frederick on June 16, 1922. The charging averments of his petition grounded on alleged indignities rendering his condition intolerable [§ 452. 010][1] were categorically denied in the answer, but defendant filed no crossbill. Only dissolution of the marital union was involved, for the two children born of the marriage, a son and a daughter, are "grown," married, and reside with their families out-of-state. Upon conclusion of a contested trial, the court took the case under advisement and on April 8, 1970, entered a general finding of the issues in favor of the defendant and against the plaintiff, dismissed the petition, and discharged defendant with her costs. Plaintiff appeals.

At the time of trial, March 25, 1970, plaintiff was sixty-seven years of age and defendant was "a year older." They had been married in Nebraska and had lived there for some time; but they had resided in Sarcoxie, Missouri, for sixteen years prior to trial, during that entire period occupying the same modest five-room house, title to which was held by them jointly. During the last eight years of that period, plaintiff had been employed by one Wild. The precise nature of his work was not shown, but it apparently was on a farm since plaintiff said "when there isn't any colts born, I work in the daytime . . . if there is colts born, I work at night." His employment was "part-time," he worked "only a half a day at a time," and his hours were "different" and "irregular." His rate of pay was $1.25 per hour, and his earnings were characterized by his counsel as "meager." There was no statement or estimate of the dollar amount of his earnings at any time; but, even in ear-

---

[1] All statutory references are to RSMo 1959, V.A.M.S., and all references to rules are to the Supreme Court Rules of Civil Procedure, V.A.M.R.

lier days when he may have worked longer hours and may have had somewhat larger paychecks, those he gave to defendant "didn't go far" and by the time the household expenses were paid "there wasn't anything left." Defendant testified that for her personal use plaintiff "never gave me any money"—"never gave me a dime," by reason of which she had found it necessary to work as a baby-sitter in other homes "ever since I have been in Sarcoxie."

Plaintiff's petition charged defendant with a motley melange of alleged indignities, ranging from the petty complaint that "defendant refuses to let plaintiff see letters from their children" to the grave accusation that "defendant has threatened on many occasions to kill plaintiff." With respect to the petty letter-reading complaint, defendant agreed "I think I've always read the letters"; but she dismissed her alleged refusal to permit plaintiff to see them with these comments, "well, land, they laid right there"—"I can't remember" that he ever asked to see one of them but "I'd say he never did." As for the grave death-threat accusation, plaintiff's own testimony minimized its significance, if not inviting disregard thereof. According to plaintiff, "at least once" defendant had said "she was going to get a gun and shoot me, but then I wasn't too scared of it, I guess." He agreed "that didn't scare" him and he "didn't really take these threats seriously."

The foundation of plaintiff's case and of his counsel's argument here is that defendant argued, fussed and nagged "at all hours of the day and night" and that she cursed him in "really loud" manner, and the record leaves no room for doubt but that she indulged in conduct of that character. Plaintiff so stated; three across-the-street and next-door neighbors, accepting the terminology employed in questions propounded by plaintiff's counsel, agreed that they had heard defendant "cursing and reviling" plaintiff during the evening hours "with some degree of frequency"; and defendant quickly agreed on cross-examination that she had fussed and quarreled with plaintiff, had cursed him, and (again in the words of plaintiff's counsel) had "used vile and abusive language towards him."

If, as we here assume arguendo, such episodes amounted to an intolerable continuous course of conduct connoting settled hatred and a plain manifestation of alienation and estrangement equaling a species of mental cruelty and evidencing a course of action whereby plaintiff's condition was rendered intolerable, they would have constituted indignities within the contemplation and meaning of § 452.010. McGehee v. McGehee, Mo.App., 448 S.W.2d 300, 302(2). But it would not have followed necessarily and as a matter of course that plaintiff was entitled to a decree of divorce, for the burden unquestionably rested on him to show by a preponderance of the credible evidence that he was not only an injured but also an innocent party [Simon v. Simon, Mo., 248 S.W.2d 560, 562(1); O'Leary v. O'Leary, Mo.App., 385 S.W.2d 346, 351(3); L——— v. N———, Mo. App., 326 S.W.2d 751, 754, and cases collected in note 3], this requirement being "neither more nor less than an application of the equitable doctrine of 'clean hands' to a divorce action." Franklin v. Franklin, 365 Mo. (banc) 442, 446, 283 S.W.2d 483, 486(7); Day v. Day, Mo.App., 433 S.W.2d 52, 54. Of course, the requirement of innocence did not necessitate proof of such exemplary deportment or angelic perfection as to have excluded all misconduct by plaintiff but rather a showing that, in the circumstances of the case, he had not been guilty of such conduct as would have entitled defendant prima facie to a divorce, if she had been free from blame. Reeves v. Reeves, Mo.App., 399 S.W.2d 641, 645(4); Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 436(6); Pipkin v. Pipkin, Mo. App., 255 S.W.2d 66, 68(2). In considering whether such showing was made, the trial court no doubt was mindful, as we also must be, that one spouse may be guilty of acts which explain and afford justification for outbursts of ill-considered conduct

on the part of the other or, differently phrased, that one spouse will not be heard to complain of acts into which he (or she) has goaded the other. Reeves v. Reeves, supra, 399 S.W.2d at 645, and cases collected in notes 5 and 6; Schwarz v. Schwarz, Mo.App., 427 S.W.2d 734, 740(8).

Agreeing with his counsel (as we do) that plaintiff was an injured party, the meritorious and determinative issue remains as to whether he was also an innocent party within the contemplation of the law. Plaintiff testified that the course of conduct alleged to have constituted indignities rendering his condition intolerable had continued over a period of four or five years prior to trial. Mayhap significantly the beginning of this period roughly coincided in point of time with two noteworthy events, to wit, (a) defendant's inheritance of about $4,000 from her mother's estate and (b) two surgical procedures on defendant. Some four years prior to trial, defendant received *"an inheritance"* of about $4,000 from her mother's estate. She "put it in the bank because I thought that would care for him [plaintiff] and I in our later years, but he fussed about it. Oh, he has given me a lot of trouble over that . . . . If a fellow wanted a dime, why he'd say, 'spend your money' . . . . It has been in his craw for years." She also explained "I need money for medical bills; I doctor all the time." On cross-examination, *plaintiff* "guessed" that defendant's inheritance had come to her "about four years ago" but he immediately denied that the inheritance had spawned any marital trouble and insisted that "I didn't even know she got it" and still did not know how much she had received, although conceding that he had learned "about a year or so ago . . . she had put it in a savings account." Out of her inheritance, defendant purchased a used 1964 Ford because she "didn't have a way to go" and spent "some more of it for medical bills." The balance in her savings account at the time of trial was indicated only by defendant's statement that the annual interest on it was about $110.

Although the precise nature of the *surgical procedures* was not shown, defendant had "major" surgery about five years prior to trial and "minor" surgery "just before that." Whatever the precipitating (and here undisclosed) reason for surgery may have been, defendant said "he [plaintiff] wasn't concerned about my surgery . . . he didn't come up there while I had surgery . . . and he didn't pay any of the doctor bills, not a cent." When defendant was hospitalized on another occasion "a couple of years ago or three . . . he did come up there to bring a letter" but again "he didn't pay any bills." Plaintiff's only response to this testimony was that *"I* had medical insurance—*I* had Pyramid, and after *I* was 65, Pyramid canceled me out and *ı* bought Bankers Life" but "she [defendant] wouldn't make no claim" for her surgery. (Emphasis ours) However, defendant insisted "the insurance wouldn't pay . . . it didn't cover it," and there was no proof to the contrary. As for the result of the surgery, defendant declared "it's a success" but "I'm very nervous . . . I can't house clean like I used to" or do "heavy laundry . . . not the heavy things." Nevertheless, she asserted that "I washed his clothes as much as I washed mine, and I never went dirty"—"there was clean clothes" for him but "he's too lazy to change."

During her trial examination, defendant made frequent mention of her nervousness, and that condition is clearly mirrored by the transcript. Although there were no doubt other contributing causes, she attributed her nervousness primarily to plaintiff's conduct. "He'd pitch his voice and I'm very easily upset"—"I tell you he made me so nervous that I got out all I could"—"the nights was terrible; the radio and television ———." Answering plaintiff's complaint that frequently she would "just go in the other room and close the door" and at times had placed a chair against the dining room side of the swinging door between that room and the kitchen, defendant said "I shut the door because he had

bought him a little TV and he runs it so loud I can't stand the noise all the time"—"I didn't want him to be bringing his noise in there to me; I can't stand it; he just kept this going day and night." Also, "he [plaintiff] had a radio on the porch and that is when Mr. Ward [one of the neighbors who had heard defendant cursing plaintiff] called over and it went just blaring and I don't think it's just for the neighborhood————." Defendant quickly admitted that she had fussed and quarreled with plaintiff but immediately added "he's cruel to me; he's never treated me nice." Likewise conceding that she had "used vile and abusive language toward him," she countered with the accusation "he does, too," and again tendered the causal explanation that "he just aggravates me until I just get nervous; I can't stand it." Without reciting further evidentiary minutiae, we express the opinion that the trier of the facts reasonably might have inferred and found that over a period of years plaintiff consciously had pursued a course of conduct which obviously aggravated and exacerbated defendant's nervous condition.

Without objection, defendant testified "he [plaintiff] has beaten on me several times" and on one or more of those occasions "a few years ago" she had sought medical attention "in Nebraska." Regardless of whether those offenses were condoned, they were subject to revival not only by a repetition of the same offense but also by the commission of other marital offenses subsequent to condonation [Gregg v. Gregg, Mo.App., 416 S.W.2d 672, 676(15, 16); Tootle v. Tootle, Mo.App., 329 S.W.2d 218, 221(3)], and it would not have been prerequisite to such condonation that the new or subsequent misconduct was of the same kind or was sufficient in and of itself to warrant a separation or divorce. J. v. K., Mo.App., 419 S.W.2d 461, 465(9, 10); Ratcliff v. Ratcliff, 221 Mo.App. 944, 949, 288 S.W. 794, 796(3).

True, plaintiff categorically denied that he had "beaten" defendant, and the testimony of the parties with respect to various other matters was not only similarly contradictory in substance but also conclusionary in nature. However, received without objection or motion to strike the probative worth and value of such conclusionary evidence was for the trier of the facts. Bourne v. Manley, Mo.App., 435 S.W.2d 420, 428, and cases cited in note 10; White v. Smith, Mo.App., 440 S.W.2d 497, 506; In re J. L. L., Mo.App., 402 S.W.2d 629, 633–634(1); Fellows v. Farmer, Mo.App., 379 S.W.2d 842, 846(2). With respect to those matters concerning which the testimony of the parties was in conflict, questions of credibility were presented for determination by the trial judge [Wilson v. Watt, Mo., 327 S.W.2d 841, 850(10); City of Jackson ex rel. Hoffmeister v. La-Chance, Mo.App., 372 S.W.2d 479, 483(3); Pipkin v. Pipkin, Mo.App., 255 S.W.2d 66, 68(3)]; and, with no specific findings of fact requested or made, all factual issues were ruled, and thereby all questions of credibility raised by conflicting testimony bearing upon those issues were resolved, in favor of defendant by the general finding of the issues for defendant and dismissal of plaintiff's petition. Rule 73.01(b); § 510.310(2); McCullough v. Newton, Mo., 348 S.W.2d 138, 142(2); Sando v. Phillips, Mo., 319 S.W.2d 648, 652(9); Galemore v. Mid-West National Fire & Casualty Ins. Co., Mo.App., 443 S.W.2d 194, 200(9); Listerman v. Day & Night Plumbing & Heating Service, Inc., Mo.App., 384 S.W. 2d 111, 120(12).

We are cognizant that our duty is to "review the case upon both the law and the evidence as in suits of an equitable nature" [Rule 73.01(d); § 510.310(4)], and that, in such review de novo, we reach our own conclusions as to the weight of the evidence. Hampton v. Niehaus, Mo., 329 S.W. 2d 794, 800(6); Trotter v. Trotter, Mo., 316 S.W.2d 482, 484(2); Masterson v. Plummer, Mo.App., 343 S.W.2d 352, 354(1). But we are also mindful that in the discharge of our appellate function we must respect the plain admonition that due regard be given to the superior opportunity

of the trial court to judge of "the credibility and characteristics of the witnesses who testified before him" [Peine v. Sater, Mo., 289 S.W.2d 101, 102(1); Cull v. Pfeifer, Mo., 307 S.W.2d 424, 428(5); Spaeth v. Larkin, Mo., 325 S.W.2d 767, 771(3); State ex rel. State Highway Com'n. v. Carlton, Mo.App., 453 S.W.2d 642, 647; Burger v. Wood, Mo.App., 446 S.W.2d 436, 442(4); Allen v. Smith, Mo.App., 375 S.W.2d 874, 880(8)] and must honor the explicit mandate that "[t]he judgment shall not be set aside unless clearly erroneous." Rule 73.01(d); § 510.310(4). See Rothenhoefer v. City of St. Louis, Mo., 410 S.W.2d 73, 75(2); In re Estate of O'Neal, Mo., 409 S.W.2d 85, 90(1); Sanderson v. Richardson, Mo.App., 432 S.W.2d 625, 630(5); Clinton v. Staples, Mo.App., 423 S.W.2d 1, 3(4, 5). Hence, while we are not bound by the action of the trial judge, it is our duty, as recognized and reiterated in many domestic relations cases, to defer to his findings unless we can point to some reason for not doing so [Reeves v. Reeves, supra, 399 S.W.2d at 648(13); Bailey v. Bailey, Mo.App., 317 S.W.2d 630, 634; Grieshaber v. Grieshaber, Mo.App., 313 S.W.2d 763, 764; Oakes v. Oakes, Mo.App., 303 S.W.2d 940, 943(2); Woodman v. Woodman, Mo.App., 281 S.W.2d 555, 559(3)], for, as it has been logically observed, an appellate court cannot declare the decree nisi to have been "clearly erroneous" unless it "can discover and present some good reason for that conclusion." Pappas v. Pappas, Mo.App., 294 S.W.2d 605, 610.[2]

Viewed in the most charitable light, the conduct of each party toward the other in the case at bar was grossly inconsiderate, intemperate, inexcusable and indefensible; and as a result thereof it may be, as plaintiff's counsel emphasized in the trial court, the parties will never become reconciled and will never live together again. But that possibility or probability neither required nor justified dissolution of the marriage contract by the trial court; and unless that court's implied finding that each party had been guilty of misconduct amounting to a cause for divorce was "clearly erroneous," we must affirm the judgment nisi [Rule 73.01(d); § 510.310(4)], for the doctrine of comparative rectitude has never been recognized in this jurisdiction and we may not nicely weigh the relative misconduct of the parties and award a decree of divorce to the one thought by us to have been less at fault. Nagel v. Nagel, 12 Mo. 53, 56–57; Barth v. Barth, 168 Mo.App. 423, 427, 151 S.W. 769, 771(2); Coons v. Coons, Mo.App., 236 S.W. 358, 359(2); R―――― v. M――――, Mo.App., 383 S.W.2d 894, 900(12); Hugeback v. Hugeback, Mo.App., 444 S.W.2d 23, 27(4).

The term "indignities" as employed in our divorce statute [§ 452.010] is purposely indefinite and general, since the feelings of different persons vary to such degree that conduct or words which would engender deep distress in one would make but a slight impression upon another. McGehee v. McGehee, supra, 448 S.W.2d at 303; Rogers v. Rogers, Mo.App., 430 S.W.2d 305, 309(3). Thus in every case involving alleged indignities, all of the detailed circumstances must be considered in the appropriate setting of their background [Clemens v. Clemens, Mo., 235 S.W.2d 342, 346]; it being impossible to formulate any all-encompassing rule, each action for divorce on the ground of alleged indignities necessarily

---

2. The judgment of the trial court was affirmed in five of the six cases cited in instant appellant's brief. McGehee v. McGehee, Mo.App., 448 S.W.2d 300; Reeves v. Reeves, Mo.App., 399 S.W.2d 641; Wilson v. Wilson, Mo.App., 354 S.W.2d 532; Thomas v. Thomas, Mo.App., 288 S.W.2d 689, certiorari denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77; Dunlap v. Dunlap, Mo.App., 255 S.W.2d 441. In the sixth case [Ezell v. Ezell, Mo.App., 348 S.W.2d 592], the judgment of the trial court dismissing plaintiff's-appellant's petition for failure to allege affirmatively that she was the innocent and injured party was set aside and the cause was remanded for trial on the merits.

must be determined on its own particular facts [Schwarz v. Schwarz, supra, 427 S. W.2d at 738(3); Reeves v. Reeves, supra, 399 S.W.2d at 644(1)]; and each such action addresses itself to the conscience of the court. Spainhower v. Spainhower, Mo.App., 441 S.W.2d 755, 761(2); Oliver v. Oliver, Mo.App., 325 S.W.2d 33, 38(7). With these trite truisms and the hereinbefore-recorded commonplace principles in mind, we have painstakingly examined and reexamined the transcript presented to us. Without reraking and resifting the testimonial ashes of this marital venture, suffice it to enter here our considered conclusion that on this appellate review we cannot find that the judgment nisi was clearly erroneous.

Accordingly, the judgment of the circuit court should be and is affirmed.

TITUS, P. J., and HOGAN, J., concur.