Ruby Lorraine LOAGUE, Plaintiff-Respondent,

v.

Henry Daniel LOAGUE, Defendant-Appellant.

No. 32211.

St. Louis Court of Appeals.

Missouri.

Sept. 20, 1966.

Allen H. Surinsky, St. Louis, for defendant-appellant.

Forrest Boecker, St. Louis, for plaintiff-respondent.

RUDDY, Judge.

Defendant appeals from a judgment of the Circuit Court denying his cross-bill for a divorce and directing him to pay plaintiff $21 per week for separate maintenance pursuant to the prayer of her petition.

Plaintiff alleged in her petition that she and defendant were married January 14, 1939, and lived together as man and wife until on or about June 1, 1959, when she entered a hospital for treatment of a mental illness; that after her release from the hospital she was ready, willing, and able to resume her place as defendant's wife; that defendant abandoned her and refused to provide a home for her or a means for her subsistence, although he was capable of supporting her. Defendant in his answer and cross-bill denies the material allegations in plaintiff's petition and alleges that plaintiff was moody, obstinate and argumentative; that plaintiff struck the defendant without just cause; that plaintiff had made it impossible for the defendant and plaintiff to live together with their children in that the children of plaintiff were afraid of plaintiff and were afraid to live in the same house with her; that plaintiff associated with other men; that plaintiff failed to properly cook, clean, wash and take care of her house, and that plaintiff deserted the defendant for over a year without cause.

Testimony given by plaintiff discloses that after the marriage ceremony plaintiff and defendant lived together as man and wife and that this relationship continued until she entered State Hospital No. 4 at Farmington, Missouri, on August 19, 1954, with the exception of a short separation, lasting a couple of months, which took place sometime in the year 1943 or 1944. During this initial period two children were born to plaintiff and defendant. Lanny Henry Loague was born August 15, 1940, and Stanley Daniel Loague was born November 28, 1945. During this period she treated her husband with affection and took care of the children. She testified that at the time of the trial both of the children were married and that Stanley was employed and self-supporting and lived with his father at 338 Lee Avenue in Kirkwood, Missouri. During the separation referred to she lived with her parents in Newburg, Missouri, except for a short period when she lived in a room of her own in Newburg, Missouri. The circumstance which led to the separation which occurred in 1943 or 1944 was when her husband told her that he " * * * had someone else  * * *." He told her it was a lady he worked with and that he liked her and wanted her, and suggested to plaintiff that it would be a very good idea if she found somebody she liked. She said her husband mentioned the name of Inez Bussey as the woman in which he was interested and that he mentioned the names of other women.

During the separation while plaintiff resided in Newburg, Missouri, she became friendly with a soldier who was a Sergeant in the Army stationed at Fort Leonard Wood. She saw him socially at times and admitted that he was in her room, but it was at a time when her grandmother was present. There was an exchange of letters between the Army Sergeant and the plaintiff and four of the letters received by the plaintiff from the Sergeant were introduced in evidence. Some of the letters contained endearing salutations and in one of the letters the Sergeant said "* * * don't worry I love you just as much * * *." She said that her relationship with the Sergeant was just a friendly one and indicated that he would have been interested in her if she had gotten a divorce. However, she said marriage was never discussed between them. She allowed the Sergeant to wear her class ring. After she returned to live with her husband she introduced him to her husband. This occurred after her husband told her that he wanted to meet the fellow, and after she had told her husband that she had been seeing him down at Newburg, Missouri. She said she told her husband that if he (the husband) did not want her, that some day the Sergeant might marry her and said that her husband said that he wanted her to come back. After she returned to her husband she received a letter from the Sergeant and answered it. She said her husband said it was all right. She admitted going to the show with the Sergeant on one occasion; denied that she ever kissed him and reiterated that her relationship with the Sergeant was just on friendly terms, but added, "* * * but would have been more if we had gotten a divorce." She said she showed her husband all the letters she got from the Sergeant and then put the letters in a dresser drawer. She did not know that her husband had the letters and had kept them during the many years.

On July 14, 1954, an application for admission to the Hospital for Mental Disorders was made to the St. Louis County Hospital. The name of the informant in the application was Henry Loague, husband of the plaintiff. This application showed, in addition to other matters, that plaintiff's intellect was good, her habits when sane were industrious and orderly, and when sane she was cheerful and talkative and was not regarded as peculiar or eccentric before the onset of her illness. It showed that the first symptoms of a change in her mental condition were noted five years before the application was made and they were manifested by lack of interest in the home and that the symptoms had been continuous since that time. According to the husband, informant, the symptoms developed gradually and the mental disorder appeared to be increasing. The answer given to a question about homicidal tendencies and disposition to injure others was, "Yes, has threatened Kirkwood business man; also members of her family." The application further showed that she was suspicious and confused and in answer to the question "What delusions, if any, does patient now have?", the answer given was "Paranoid." Following the filing of this application she was placed in Malcolm Bliss Mental Health Center in St. Louis, Missouri.

On July 21, 1954, the Probate Court of St. Louis County, Missouri found plaintiff to be a person of unsound mind and ordered that she be restrained and confined in the State Hospital No. 4 at Farmington, Missouri as a county patient until the further order of the court.

On August 13, 1954, she was admitted to State Hospital No. 4 at Farmington, Missouri. She was accompanied by her husband and the Admission Sheet shows the husband to be the informant of the information contained on said sheet and also shows that he was her guardian at the time. At the time of her admission to this hospital her husband informed the authorities that she kept telling their fourteen year old boy to always be careful, that he might get killed. The Admission Sheet of the hospital also showed that patient had been employed at a department store in

Kirkwood, Missouri until July 13, 1954, at which time she was picked up for peace disturbance. It shows that in February of 1953, she was fired from the McDonnell Aircraft Corporation after three months for "bad conduct" and then proceeded to contact the FBI about the supposed Communists' infiltration at the aforesaid plant. It also shows that the husband was contacted by a lawyer of a neighborhood undertaker because of a threatening letter written by plaintiff to the undertaker stating that she was going to kill him and his family. Similar letters were also sent to a minister. The hospital record shows that her husband took plaintiff out on twelve weekend visits with the approval of the hospital. This was during her first stay at the hospital. While she was at the hospital on this occasion she received thirty-two insulin comas combined with ten electric shock treatments. The diagnosis was "schizophrenic reactions—paranoid type." She was released on a convalescent leave to the custody of her husband on November 13, 1954. On this occasion her husband signed an agreement to take charge of a furloughed patient wherein he agreed to exercise proper care, protection and supervision over plaintiff, to report at least once every two weeks to the superintendent of the institution, and to convey plaintiff from and to the institution, if required by the superintendent, without expense to the State. In this agreement he stated that his financial condition was such that it was possible for him to make good his guarantee at any time. However, the records show that she was never brought back to the hospital at any time until her second visit which will be discussed later. Also, the hospital records show no reports from defendant to the superintendent.

Plaintiff's husband brought her home from the hospital and she said that she kept house and for the first time in her life went to a few places, stating that she had not enjoyed much social life before. She conducted herself towards her husband properly and kept house as much as her health would permit. She took care of her husband and the children. She prepared their food and their clothing. She denied that she ever attacked them with scissors and that she ever threatened to hit them with a broom. She thought her children felt pretty good toward her at the time. She said that her husband never took her out to dances and that they had an agreement that he would go out by himself one evening every other week and she would do the same on alternate weeks. She said she used to go to dances and would dance with other men and that her husband knew about this. She never left any of these places with men in her company. The last time her husband ever gave her any money for personal expenditures was when she was living in the house with him between the time of her release from the hospital in 1954 and her re-entry in the hospital in 1957.

Plaintiff again was admitted to and placed in State Hospital No. 4 at Farmington, Missouri, on July 24, 1957. For approximately two months prior thereto she had been a patient at the Glenwood Sanitarium in St. Louis County, Missouri. Plaintiff said that her husband put her back in the hospital. On June 26, 1957, plaintiff again was declared to be incompetent by the St. Louis County Probate Court by reason of mental illness and was ordered confined in the State Hospital No. 4 at Farmington, Missouri, as a county patient. On · this second visit to the hospital the Admission Sheet shows the husband to be the informant and shows that after the previous hospitalization patient got along fairly well for a couple of months. It then shows that the patient gradually began to slip back into the former condition and that at the time she was taken to the Glenwood Sanitarium her condition was worse than her former condition; that patient lost interest in her appearance and her house and that the symptoms were very similar to her previous attack only she seemed to forget about the Communists but retained the delusion about the FBI. She felt like people

were against her and she stayed in bed most of the time. The Admission Sheet shows her husband as her guardian. The hospital records show that upon her admission on July 24, 1957, she was maintained as an indigent supported by St. Louis County.

Plaintiff remained in State Hospital No. 4 on this occasion until June 8, 1958. Plaintiff's husband came to visit her on only one occasion during her second stay in the hospital. This was after she was there four or five months and she said that he did not stay very long. He did not bring the children with him, and no one else ever brought the children to visit her. In connection with her release from the hospital she was asked:

"Q. Now, when was the last time that you had occasion to have any communication with your husband? Was it the occasion of this visit or some later time? A. Well, the last time at the hospital I needed somebody to sign me out, and so I called him, and he got real hysterical and said he didn't intend to do anything for me."

Immediately after the answer defendant's counsel objected to the question and answer on the ground it was immaterial and irrelevant to any issue in the case and that it was incompetent. This objection was overruled and defendant's attorney added, "I also meant to say it would be privileged communication between husband and wife." The court overruled this objection. She said this was the last time she had talked to her husband.

Plaintiff introduced, over the objection of defendant, copies of two letters from Dr. James F. McFadden, a staff member of State Hospital No. 4, which were approved by Dr. Emmett S. Hoctor, Superintendent of the institution. The first letter, dated May 19, 1958, addressed to the defendant stated:

"It is my opinion that your wife has improved sufficiently to go home for a visit, therefore, we are willing to let her go

if you call for her at your earliest convenience."

On June 2, 1958, a letter of similar import was written to the defendant and is as follows:

"We feel your wife has improved sufficiently to go home on parole. We will appreciate you calling for her at your convenience, and present this letter at the desk when you call."

The hospital records show no response to these letters. On June 8, 1958 plaintiff left the hospital in the company of her father and her brother and went to the home of her father at Newburg, Missouri. Her father signed the agreement to take charge of a furloughed patient. The hospital records show that the reason for the parole was that the patient had improved, that her mental reactions were good and her physical health was good. She was advised to report regularly and the diagnosis was the same as given on her first visit to the hospital. She stayed with her father at Newburg, Missouri just a short while and then came to St. Louis and went to work for Famous and Barr Company, a department store. She said that from the time she was released to her father from the hospital until the time she brought the separate maintenance suit her husband contributed nothing toward her support. When asked if she had asked her husband for any support she said " * * * I told him I needed help." She said that prior thereto he had told her that he did not intend to do anything for her, and that thereafter she did not ask him for support; however, she said she wrote and told her son to tell her husband that she needed support. She wrote the son because the husband was in a hysterical state and as she put it, " * * * was radical * * *." At the time of the hearing she was employed at Shoppers' Fair on Chippewa Street in St. Louis, in the jewelry department as a sales lady. When asked if she did not tell her husband that she would not go back she said, "No, I don't recall that." She said that she did tell him

that she would not go back if that was the way he wanted it, but that she did need help. All of this took place after she was released from the hospital the second time.

On one occasion in 1960, when living on Gibson Avenue, she had just gotten out of the bath tub when her husband came to the door. Her husband indicated that he wanted to talk to her, and she told him that she did not want him to come in at that time because she was insufficiently clothed. She said he said "okay" and walked away. He did not ask her to come back to him, said she did not refuse to go back to him, and he did not ask her how she was feeling. She said during the period after her second visit to the hospital she supported herself on her earnings and on what her father gave her, and again stated that her husband did not give her anything.

The record in this case shows that the defendant, husband of plaintiff, was plaintiff's legal guardian at the time she entered State Hospital No. 4 for the first time in 1954, and that he continued as her legal guardian until shortly before November 5, 1964. On November 5, 1964, plaintiff was adjudicated to be of sound mind and capable of managing her own affairs by the Probate Court of St. Louis County, Missouri.

Defendant in his testimony said that the first time he knew about any mental trouble concerning his wife was when she wrote the threatening letters in the year 1954. He said that from the very first day of their marriage his wife was not a good housekeeper and that she " * * * got a little worse as she went along * * *." He admitted that she cleaned the house once in a while and that she kept herself clean. Prior to her first stay in the hospital and after the first separation he found a picture in a drawer at home which made him " * * * pretty mad * * *." He said he discussed the picture with his wife and they had quite a round about it. Despite this controversy he and his wife continued to live together as man and wife.

Defendant's wife told him that she had found somebody " * * * she liked." She introduced the Army Sergeant to her husband and the two talked. Defendant said, " * * * I didn't say too much to him, no cause for argument, if she liked him." He did not know that the Sergeant was writing to his wife and did not know that his wife was writing to the Sergeant. He did not approve of the exchange of letters. He said he found the letters around the house about six months later (probably meaning after the letters were written). He said his wife asked him for a divorce several times. When defendant's attention was called to the Application for Admission to Hospital for Mental Disorders filed with the St. Louis County Hospital, wherein it was shown that the informant of the information contained therein was the defendant, he said he did not remember saying some of the things contained therein but admitted that he noticed that there was something wrong with his wife, adding, " * * * but I'm not a doctor and I don't know that there was something wrong." He said that when his wife was released to him from the State Hospital in 1954, there were certain medications called for but that he could not get her down to the hospital for this purpose as he was instructed to do upon release. He said that after her release from the hospital in 1954, she did not take care of the house and that she had something to fight about all the time. He admitted that at times he was the cause of the fight, but said that most of the time he did not give her any cause.

Defendant went to see his wife in 1960 when she lived on Gibson Avenue. He said that she let him in, " * * * and I tried to make up with her, and no, no dice." She told him she would not have anything to do with him. He testified, " * * * I asked her if she wouldn't reconsider and have something to do with me again, you know, but no, she wouldn't do it. * * *" He said he asked her to come back and that she said that she would not, because she would be dissatisfied. He said that

while she was in the hospital the second time she wrote him some letters stating she did not want to come back. However, he stated that he did not have the letters. He said that she never did ask him for any money. When he was asked if he knew a lady named Inez Bussey, he answered, "Not that I know of." He said the name did not sound familiar to him and when he was pressed as to whether or not there was such a person, he said, "Oh, she used to work at Small Arms where I worked." He denied that he went out with her or had anything to do with her. He said that after his wife returned home, after her first visit to the hospital, that he and the children would bring her food while she was in bed and said she would run them out. When asked why he did not visit his wife more frequently during her second stay in the hospital he said, "I wasn't financially able most of the time * * *." He admitted that he did not offer to take her back after her release from the second visit to the hospital. When asked if he knew she was a mentally incompetent person he answered, "Well, I don't know. The doctor released her from the hospital. Q. And that's all you cared? A. That's all I could care." He admitted that he paid nothing for her upkeep after she got out of the hospital the second time until the order was made for the payment of the pendente lite maintenance allowance. He admitted that he had quit making payments under the pendente lite order, stating that he could not keep up the payments. Admitted that he had never had a gross pay less than $130 a week in the period immediately before the hearing, but said that despite this he could not pay plaintiff the pendente lite allowance. Admitted that he was holding some property of his wife as her guardian and said that he had approximately $1,000 in a bank account on deposit and three Savings Bonds of $25 each belonging to her. He admitted that he owned about thirty $50 bonds and that the house was held in the name of both of them. He denied that he ever agreed that his wife would have one weekend off to go out by herself and that he would have

the alternate weekend. He admitted that he used to drink quite a bit and said that he was not a dancer. He said that he would not take his wife back at the time of the trial, complaining that she left him, adding, "She said she wouldn't come back even before she got out of the hospital."

He acknowledged that he had a letter from his wife telling him that she could come out of the hospital. He admitted that he did nothing about it, giving as his excuse, that "The boys were afraid for her to come back to the house, and I had no other place to keep her." He admitted that he was her legal guardian at that time. He made no attempt to consult with the doctors at the hospital about her release and although he heard rumors that she was out of the hospital he did not know where she was. He said that he and his wife had not lived together since 1957 when she went to the hospital.

The two sons of plaintiff and defendant testified as witnesses for their father, the defendant. Lanny, age twenty-four at the time of his testimony, left the home of his father in March of 1958. He said that during 1952 or 1953 he had been after his mother to iron clothes for him to go to a scout meeting which seemed to provoke an argument between the two and he said his mother got mad and chased him out of the house with a pair of scissors which she was using to trim his scout pants. He said this incident put him in fear of his mother. He said he quit school because of the embarrassment he suffered from the condition of his clothes. He first noticed that his mother acted abnormally during the period from 1954 to 1957. He did not know whether her act with the scissors was due to her mental illness or not. He said he knew his mother had a problem but his father had never mentioned that she needed help. When reminded that he did not visit his mother when she was in the hospital on the second occasion he was asked, "You weren't interested in her whereabouts or her situation were you? A. No." When asked if he could have

lived in the house with his mother when she got out of the hospital in 1958 he said, "I just didn't want to. I mentioned to my father I just didn't care, since she hasn't done anything for me, I just didn't want to be around her."

Stanley, the youngest son, nineteen years of age at the time of his testimony, said that he lived with his wife and his daughter at his father's home. He said that some time in 1953 his mother pounded him on the back and chased him around the back yard with a broom following an altercation he had with her. On another occasion when he was going to graduate from the sixth grade in school he told his mother he did not want her to go because she dressed so sloppily and it embarrassed him. He said his mother got mad and said, " * * * if I went down to my friend's house to play she hoped I got killed." He said that she reached for a knife and started towards the door but that either his father or his brother stopped her. He said he was afraid of his mother; admitted that he knew she had a problem of mental illness, but said he did not want her to come back home. He told his father that he would " * * * do anything, get in jail, or anything to get away if he brought her (his mother) back."

In the first point we take up for consideration, defendant contends that the trial court improperly received the record copies of the two letters addressed to the defendant and written by Doctor James F. McFadden, a staff member of State Hospital No. 4. These letters show that at the time they were written plaintiff had improved sufficiently to go home for a visit and that the institution was willing to let her go home if defendant would call for her at his earliest convenience. The basis of defendant's contention is that there is no showing that the subject letters were actually mailed. We must overrule defendant's contention for the reason that the content of these letters was admitted for a limited purpose and was admitted for

that purpose by consent of defendant. When these letters were offered, plaintiff's counsel informed the court that these letters showed plaintiff's " * * * mental state at that time, * * * " meaning the time of the date of the letters. Immediately thereafter defendant's counsel said, "For the purposes of showing the mental state, I don't object, but other findings are not binding on the defendant." The court in its ruling said,

> "Well, this is different in that this is a letter by the doctor, who, evidently was in charge of the treatment of the patient, approved by the superintendent, stating that in his opinion, she was in such mental state that she could be released. I think that's a part of the hospital record *to show the progress or lack of progress and what the situation was,* and I think for that reason—and it was probably made and entered as of the time—I think this is an official record of the hospital. That is admissible. The Court will admit it." (Emphasis ours.)

As we view the ruling of the court it admitted the letters for the limited purpose of showing that plaintiff, on the dates indicated, was in such a mental state that she could be released from the hospital and that this indicated the progress she was making. Defendant said he had no objection to the admission of the letters for that purpose and they will only be considered for that purpose by this court, as we are sure they were so considered by the trial court. This contention of defendant must be overruled.

In the next point we take up for discussion, defendant complains that the trial court, " * * * improperly admitted evidence of conversations between plaintiff and defendant, which are privileged." At no place in defendant's brief does he tell us what conversations he complains about. However, we suspect it was the conversation plaintiff related she had with defendant the last time she was in the State Hospital when she was looking for somebody,

as she said, " * * * to sign me out * * *." She said she called her husband and that he got hysterical and said he did not intend to do anything for her. This was the only conversation objected to on the ground it was a privileged communication. The courts have frequently ruled that conversations between husband and wife, which do not take place in the presence of a third party, are privileged communications and are not admissible in separate maintenance or divorce actions. Oliver v. Oliver, Mo.App., 325 S.W.2d 33, and cases cited therein. However, we do not believe the admission of this conversation was prejudicially erroneous because there was other ample evidence to show that defendant did not intend to do anything about getting his wife out of the hospital. In his testimony he acknowledged receiving a letter from his wife telling him she could come out of the hospital. He admitted he did nothing about getting her out, although he was her guardian and had placed her in the hospital. There is other evidence to show he did not intend to do anything for plaintiff. Excluding the privileged communication objected to, there is an abundance of other evidence to show that defendant did not intend to do anything to facilitate plaintiff's release from the hospital or to do anything for her after her release. The conversation objected to will not be considered by us on appeal and we hold that its admission was not prejudicial error and was harmless. Coleman v. Coleman, Mo.App., 318 S.W.2d 378.

■ The next and principal point urged by defendant is that plaintiff has failed to prove abandonment by the defendant. Although a suit for separate maintenance is a statutory action by law, it is sui generis, based on equitable principles, and governed by equitable procedure and we are required to weigh the equities between the parties as they are revealed by the evidence in each case. Forbis v. Forbis, Mo. App., 274 S.W.2d 800, 809; Oakes v. Oakes, Mo.App., 303 S.W.2d 940, 943; Reeve v. Reeve, Mo.App., 160 S.W.2d 804, 808. We will render such judgment as we think is right under the law and the evidence. We are admonished by Section 510.310 RSMo 1959, 31 V.A.M.S. that the judgment shall not be set aside unless clearly erroneous and due regard is to be given to the opportunity of the trial court to judge of the credibility of the witnesses. While we are not bound by the findings of the trial court it has been stated numerous times that we should not disturb such findings unless we can point to some good reason for doing so. Forbis v. Forbis, supra. Where there is a sharp conflict in the testimony and the evidence does not greatly preponderate one way or the other, we resolve the conflict by according due deference to the findings of the trial judge because of his opportunity to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony. Oakes v. Oakes, supra.

■ As we have pointed out separate maintenance is a statutory action at law (Section 452.130 RSMo 1959, 24 V.A.M.S.) and in order to recover plaintiff must show that her husband abandoned her without good cause and refused or neglected to maintain and provide for her. Forbis v. Forbis, supra. There is no need to repeat the extensive statement of facts we have related in order to demonstrate that defendant has refused or neglected to maintain and provide for plaintiff after she entered the State Hospital No. 4 on the occasion of her second visit on July 24, 1957. This is amply shown by relating a few reflections supported by the record. The record shows that the last time plaintiff received any support money was prior to her entry into the hospital in 1957. While in the hospital she was maintained as an indigent person supported by St. Louis County and not by defendant. He admitted paying nothing to his wife for her support or upkeep after she got out of the hospital on June 8, 1958. In our perusal of defendant's brief we do not find that he seriously contends that he did maintain and provide for his wife after she entered the

hospital the second time. Defendant seems to place his whole reliance on the contention that plaintiff has failed to prove abandonment by him. He contends that if a separation is shown in the record it was with the consent of plaintiff. He relies upon the record, wherein it was shown when plaintiff was asked if she did not write to her husband and tell him she did not want to go back to the house, she answered, "I told him I wouldn't go back if that was the way he wanted it, but I needed help." This answer of plaintiff to the question propounded does not indicate that she refused to go back to the defendant. The answer clearly indicates to us, as it must have to the trial court, that she would not go back to the defendant if he did not want her to come back. We think this interpretation of her answer is amply supported by the record which clearly shows she did not tell her husband she would not go back. We defer to the trial court's findings on this issue in the testimony.

■ It is unnecessary to engage in a lengthy perusal of the facts which in our opinion clearly demonstrate an abandonment of plaintiff by the defendant, if not at the time he placed her in the hospital on the second occasion, certainly at the time she was released from the hospital on that occasion. During plaintiff's three months' stay in the hospital in 1954 he visited his wife twelve times. While plaintiff was in the hospital on the second occasion he visited her only one time in the period of her stay at that hospital which was approximately ten and one-half months. The record shows that he placed her in the hospital at which time he was not only plaintiff's husband, but in addition, was her legal guardian.

■ After having placed his wife in the hospital in 1957 he failed and refused to get her when she was eligible for a convalescent leave in June, 1958. He admitted receiving a letter from his wife telling him she could come out of the hospital and he admitted he did nothing about it.

He admitted he did not offer to take his wife back after her release from the hospital, although he knew she was still in the area between mental competency and incompetency. His attitude was that of complete abandonment in her hour of great need, shrugging off her mental condition and her needs with an answer indicating his indifference, "That's all I could care." He attempts to excuse his abandonment on the ground that his wife did not say, " * * * 'Henry, let me live with you.' " The fact is she did say it, in effect, when she wrote the letter he admitted receiving telling him she could leave the hospital. Obviously, she invited him to come and get her. Although he took her out of their home and placed her in a mental institution he refused to take her back. This in our opinion under the circumstances of this case constitutes abandonment in law and in fact. As said in the case of Forbis v. Forbis, supra, 274 S.W.2d l. c. 808, in a quotation from Kindorf v. Kindorf, 178 Mo.App. 635, 640, 161 S.W. 318, 320(4): "And where a husband wrongfully drives his wife from him, and turns her out of doors, such conduct must perforce constitute an abandonment of her. * * *" Defendant also seeks to excuse his abandonment of plaintiff on the ground that his wife went to dances after she got out of the hospital in 1958 and danced with other men and on the further ground that she associated with the Army Sergeant in 1943 or 1944 and exchanged letters with him. The episode between plaintiff and the Army Sergeant took place as shown in 1943 or 1944, which was about fifteen years before the abandonment. After this episode plaintiff and defendant lived together as man and wife and in 1945 there was born to them their youngest son, Stanley. Whatever took place during this initial separation in the earlier years of their married life was certainly condoned by the subsequent action of defendant and his wife.

■ It is true that plaintiff went to dances and danced with other men. However, she said that this was with the con-

sent of her husband when she was living with him and evidently because her husband did not care to dance, which he admitted. While the husband denied that he consented to her attendance at these dances, we defer to the trial court's finding on this matter and find that he knew about her attendance at these dances and consented thereto. We do not approve such action on the part of plaintiff, but we do not think that under the circumstances it amounted to an indignity.

Finally, defendant presents the contention that if this court finds he did abandon the plaintiff that he should be excused from the abandonment because it would have been impossible for the plaintiff to live in the same household with their youngest child. At the time plaintiff was released from the hospital the youngest son was approximately thirteen years of age. Of course this reason advanced by defendant is insufficient to excuse his failure and his neglect to maintain and provide for plaintiff and is insufficient to excuse his abandonment of plaintiff. It must be remembered that plaintiff was under the disability of mental illness from 1954 and probably five years prior thereto until she was restored to reason November 5, 1964. The scissors incident, if it happened, took place in 1952 or 1953. The oldest son, Lanny, said he knew his mother had a problem but that his father never mentioned that she needed help. Therein lies the weakness of defendant's contention. He failed in his duties as father and as husband to acquaint his children with the needs of their mentally ill mother. Had he instructed his children on the kind of help they could have given their mother, in all likelihood there would have been no problem in her returning to the household after she left the hospital. And the oldest son, Lanny, would never had been heard to say that he was not interested in the whereabouts or the situation of his mother because she had done nothing for him. The children should have learned from their father that their mother's greatest need was to be needed. Defendant could have learned upon inquiry at the hospital that the authorities felt his wife had improved sufficiently to go home. This he failed and neglected to do. We conclude with a comment we made in the case of Fuemmeler v. Fuemmeler, Mo.App., 381 S.W.2d 27, 1. c. 30, involving a mentally ill wife:

"Surely a partner to the marriage vows, 'in sickness and in health, for better and for worse,' is entitled to at least the same protection of the law as a person accused of crime. The vows of marriage would indeed be tied by a frail thread if the inconvenience caused by the illness of one marriage partner gave a right of divorce to the other. * * *"

This same comment is applicable to the facts of this case.

The equities in the record before us are overwhelmingly in favor of plaintiff. We find no error in the judgment of the trial court and therefore it should be affirmed. It is so ordered.

WOLFE, P. J., concurs in result only.

ANDERSON, J., concurs.