Peggy J. KEIM, Appellant,

v.

Keith C. KEIM, Respondent,

and

Carlos K. Schwarz, Third Party Defendant.

No. 47749.

Missouri Court of Appeals, Eastern District.

Aug. 21, 1984.

Charles P. Todt, St. Louis, for appellant.

Reginald P. Bodeux, St. Charles, for respondent.

Before CRANDALL, P.J., PUDLOWSKI, J., and KENNEDY, Sp. J.

DON W. KENNEDY, Special Judge.

This is a dissolution case in which the wife, Peggy, also filed a third-party petition against third-party defendant, husband's (Keith's) stepfather, Mr. Schwarz, to set aside a quitclaim deed to third-party defendant, by which she and Keith had conveyed their residence to him.

The court declined to set aside the deed, granted the dissolution and awarded Peggy $20 per week child support for the couple's seven-year-old child, Jennifer, whose custody was given to her.

The wife appeals with three points of alleged error. We affirm the judgment for the reasons hereinafter explained.

I

Peggy's first point is that the evidence is not sufficient to support the court's refusal to set aside the deed.

The deed sought to be set aside was to the Picardy residence, so named for its location at 904 Picardy Street in St. Charles, Missouri. It was the residence occupied by the parties at the time of their separation on or about December 10, 1981, or perhaps as early as November 27. The

deed was dated December 1, 1981, although Peggy insists she signed it on December 30. Peggy continued to occupy the house along with the couple's child, and apparently was still occupying it at trial time in May, 1983. Both Keith and Peggy joined in the quitclaim deed to Mr. Schwarz after their separation and the commencement of divorce proceedings. Peggy seeks to set the deed aside on grounds of Mr. Schwarz's fraud and undue influence practiced upon her.

The trial court declined to set the deed aside. We find that his decision was well supported by the evidence in the record, and we affirm the same. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

The history of the Picardy house and the events leading up to the quitclaim deed are as follows. This is largely Mr. Schwarz's version, as amplified at some points by the testimony of Keith and Peggy. Of course, we take the evidence which is most favorable to the trial court's decree. *Askins v. James*, 642 S.W.2d 383, 386 (Mo.App.1982); *In the Interest of J.J.M.*, 592 S.W.2d 862, 863 (Mo.App.1979).

The house had been purchased by Mr. Schwarz on November 26, 1980, for a cash price of $72,000, as a residence for Keith and Peggy. According to Mr. Schwarz's testimony, he was motivated by a desire to keep their marriage together, which was on rather a precarious footing. The couple had agreed that the residence would be helpful. Mr. Schwarz directed that the deed to the property be placed in Keith's and Peggy's names, although no one has claimed in these proceedings that it was a gift. They were to pay him $500 per month. The figure was set on the basis of the couple's ability to pay, according to Mr. Schwarz's testimony.

On March 27, 1981, Keith and Peggy executed to Mr. Schwarz a promissory note for $65,000 and a deed of trust on the house securing the payment of the note. The note bore no interest and it was payable at the rate of $500 per month. Mr. Schwarz did not record the note and deed

of trust at that time but kept it in his safe deposit box.

The couple continued to occupy the house until their separation in December of 1981. The $500 monthly payments stopped after November. There were the taxes soon to be paid, and an outstanding tax bill. The total of the taxes was $1200 or $1300, or that may have been the amount of the tax bill by itself; the record is not entirely clear. The couple was financially unable to pay the taxes, and Mr. Schwarz volunteered to pay the taxes for them.

On or about December 1, Mr. Schwarz had prepared a quitclaim deed by which Keith and Peggy reconveyed the property to him. Keith signed it at Mr. Schwarz's home, or at Keith's place of employment. Mr. Schwarz took it to Peggy at her home for her signature. She signed it on her kitchen table. According to Mr. Schwarz's testimony, he explained to her what it was and she understood what its legal effect was.

The subject of the $500 monthly payments came up on Christmas Day, when Mr. Schwarz and his wife went to the Picardy house to exchange gifts with Peggy and the couple's small daughter Jennifer. Keith was not there; he and Peggy were now separated. At that time Peggy gave Mr. Schwarz a check for $250, half the $500 payment for December, and Mr. Schwarz told her he would try to get the other $250 from Keith. According to Peggy's testimony, Mr. Schwarz at this time declared a "moratorium" on future payments.

Peggy never made any more payments on the house. She continued to live in the house, as earlier stated, at least until the divorce trial in May, 1983.

The quitclaim deed and the deed of trust were recorded in the recorder's office on December 30, 1981.

Prior to their moving into the Picardy house in November, 1980, Keith and Peggy had lived in a house on Campus Street. This house had been owned by Mr. Schwarz and his wife. Keith and Peggy paid to Mr.

Schwarz "whatever my interest and principal payments and taxes, whatever the escrow figure was from General Mortgage Company, that would be their figure." This amount according to Peggy's testimony was $150 per month. After Keith and Peggy moved out and moved into the Picardy house, Mr. Schwarz sold the Campus property.

Keith's testimony indicated that when the Picardy house was purchased by Mr. Schwarz, the understanding was that Mr. Schwarz was carrying the financing on an informal basis until Keith and Peggy could finance it through a regular banking institution, and they would pay Mr. Schwarz $500 a month in the interim. The going interest rate at that time was almost 19% per annum and the monthly payments would have been about $800 per month, which, according to all the testimony, the couple could not manage.

Peggy's version varied somewhat from that just recounted, which, as earlier stated, is drawn largely from Mr. Schwarz's testimony. She said that when she signed the note and deed of trust she did not know what it was; did not know until after she had signed the quitclaim deed and had begun to investigate that her name had been on the title; did not know or understand what the quitclaim deed was or what its legal effect was; and that when it was presented to her to sign it was concealed by some other papers. Allowing, for argument's sake only, that her testimony if believed would have made a case for setting aside the quitclaim deed, it was not incumbent upon the trial judge to believe her version; he could accept Mr. Schwarz's version instead. *Whitenton v. Whitenton,* 659 S.W.2d 542, 546 (Mo.App.1983); *Trunko v. Trunko,* 642 S.W.2d 673, 674–75 (Mo. App.1982). Peggy was an intelligent woman, a college graduate and a high school science teacher, whose protestations of naivete might very well have been discounted by the trial court.

The cases cited in Peggy's brief explain the principles applicable to suits in equity to set aside executed deeds on the grounds of fraud and undue influence, but they are not analogous upon the facts and they do not support her position. See *Perkins v. Rantz,* 631 S.W.2d 907 (Mo.App.1982); *Drake v. Greener,* 523 S.W.2d 601 (Mo. App.1975).

## II

■ The foregoing brings us to Peggy's second point, that the court erroneously excluded evidence which if admitted would have produced another result. She complains of the court's sustaining an objection to questions aimed at eliciting statements made to her by Keith supposedly admitting to certain instances of marital misconduct on his part. The objection was made and sustained on the basis that the statements were confidential communications of husband to wife, hence not admissible against him, § 491.020, RSMo 1978. The admissibility of the evidence aside, Peggy has not appealed from the property division portions of the decree nor from the child custody and visitation provisions thereof. Only on those issues would Keith's marital misconduct have been relevant. There was no prejudice in excluding his admissions of marital misconduct.

■ She complains of the exclusion of her testimony of another statement made by Keith to her. She said that Keith had made a statement "as to what was being done with" the payments made by them to Mr. Schwarz on the Campus Drive property. (From the tenor of Peggy's attorney's questions to her and other witnesses, there was some nebulous idea that the payments were being accumulated to apply on the purchase of another residence.) When asked what Keith had said, an objection was made that this constituted "testimony in the marital privilege." Later Keith was called by Peggy as a witness, and he was asked, with reference to payments made to Mr. Schwarz on the Campus Drive property, "Isn't it true that you told your wife at that time that some portion of that particular money was going to be available as they call it, contribution to or credit to the purchase of some later real estate?" An

objection on the ground of "marital privilege" was sustained.

Keith was also asked with reference to the time preceding the purchase of the Campus Drive property: "Is it true that you called her one night and asked her how would you like a home?" This was evidently to support Peggy's complaint that she had had no real voice in the purchase of the Campus Drive house. The "marital privilege" objection was once again sustained.

As to none of the questions noted above was there any offer of proof by Peggy. See Mo. Evidence Restated, Sec. 103(a)(2) (MoBar 1984). We do not know what the answers were expected to be, or whether they would have aided her case. Prejudice to Peggy's case in the exclusion of these answers is difficult to discern. The subjects of the excluded Keith-to-Peggy statements were rather thoroughly gone into by other testimony, and we cannot conceive that Keith's answers to these questions would have had the slightest effect on the outcome of the case. We would not reverse the case and remand for retrial on the possibility that the answers if allowed might have helped Peggy's case.

The parties join issue on the applicability in dissolution cases of the privilege accorded to spousal communications under Section 491.020. Wife recognizes the application of the rule in dissolution cases under present law, as stated by *Oliver v. Oliver*, 325 S.W.2d 33 (Mo.App.1959). See also *Loague v. Loague*, 407 S.W.2d 92 (Mo.App. 1966); *Pippas v. Pippas*, 330 S.W.2d 132 (Mo.App.1959); Comment, "Confidential Communication Privilege of Husband and Wife: Application Under the Missouri Dissolution Statute," 43 Mo.L.Rev. 235 (1978). She says, though, in an extensive and scholarly brief, that the law should be changed to allow proof of confidential communications between spouses in dissolution cases. We have not reached that question, however, disposing of Peggy's contentions as we have in the preceding paragraphs hereof.

### III

For her final point, Peggy complains of the $20 per week child support award to be paid by Keith to her for Jennifer's support. We find no abuse of discretion and we deny the point. Peggy's weekly take-home pay was $267.50, while Keith's net weekly take-home pay was $170. The child was seven years old at the time of the dissolution. The court could under the evidence and under the standards of § 452.340, RSMo 1978, have reasonably made the award he did make.

The judgment is affirmed.

All concur.